# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE AUG 20 2015
Madsen C.J
CHIEF JUSTICE

This opinion was filed for record
at 8:00Am on Aug. 20, 2015

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| FILO FOODS, LLC; BF FOODS, LLC; ALASKA AIRLINES, INC.; and THE WASHINGTON RESTAURANT ASSOCIATION,<br><br>Respondents/Cross-Appellants,<br><br>v.<br><br>THE CITY OF SEATAC; KRISTINA GREGG, CITY OF SEATAC CITY CLERK, in her official capacity,<br><br>Appellants/Cross-Respondents,<br><br>THE PORT OF SEATTLE,<br><br>Respondent,<br><br>SEATAC COMMITTEE FOR GOOD JOBS,<br><br>Appellant/Cross-Respondent. | No. 89723-9<br><br>En Banc<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Filed _____ AUG 20 2015 _____ |

OWENS, J.—In 2013, voters from the city of SeaTac approved local Proposition 1. That initiative establishes a $15-per-hour minimum wage and other benefits and rights for employees in the hospitality and transportation industries in the city of SeaTac. *See* ch. 7.45 SEATAC MUNICIPAL CODE. Opponents of Proposition 1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

challenged its validity under state and federal law. The trial court largely rejected these challenges, with two exceptions. The trial court held that (1) under state law, Proposition 1 could not be enforced at the Seattle-Tacoma International Airport and (2) federal labor law preempted a provision of Proposition 1 protecting workers from certain types of retaliation. We reverse both of these rulings. We hold that Proposition 1 can be enforced at the Seattle-Tacoma International Airport because there is no indication that it will interfere with airport operations. We also hold that federal labor law does not preempt the provision protecting workers from retaliation. We otherwise affirm the trial court and thus uphold Proposition 1 in its entirety.

## FACTS AND PROCEDURAL HISTORY

The SeaTac Committee for Good Jobs (Committee) is a coalition of individuals, businesses, neighborhood associations, immigrant groups, civil rights groups, faith organizations, and labor organizations. In June 2013, the Committee circulated a petition to city of SeaTac voters that proposed a set of minimum employment standards for certain hospitality and transportation employers in the city of SeaTac, including an hourly minimum wage of $15. After finding sufficient signatures supporting the petition, the SeaTac City Council put the initiative on the ballot.

Filo Foods LLC, BF Foods LLC, Alaska Airlines Inc., and the Washington Restaurant Association (collectively Filo Foods) sued the city of SeaTac and City

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Clerk Kristina Gregg (collectively the City) to challenge the sufficiency of the

signatures to put Proposition 1 on the ballot. The Committee intervened in support of

the City. Thereafter, the superior court held that Proposition 1 could not go on the

ballot, but the Court of Appeals reversed, *Filo Foods, LLC v. City of SeaTac*, 179 Wn.

App. 401, 319 P.3d 817, *review denied*, 181 Wn.2d 1006, 332 P.3d 984 (2014),[1] and

the measure appeared on the November 5, 2013, ballot. Voters approved Proposition

1 by a narrow margin. By its terms, it was scheduled to take effect on January 1,

2015.

Shortly after the election, the superior court allowed Filo Foods to amend its

complaint to include substantive challenges to Proposition 1, now an enacted

ordinance, and to name the Port of Seattle as a defendant. The Port of Seattle is a

special-purpose municipal corporation that, among other things, owns and operates

the Seattle-Tacoma International Airport within the city of SeaTac's territorial

boundaries. In the amended complaint, Filo Foods alleged that Proposition 1 is

invalid on a number of grounds, including that it (1) violates the single-subject rule,

(2) violates the Port of Seattle's jurisdiction over the Seattle-Tacoma International

---

[1] This court stayed a petition for review in the ballot signatures case pending a final decision in this case. Order Deferring Review, *Filo Foods, LLC v. City of SeaTac*, No. 90113-9 (Wash. Apr. 30, 2014). The issues relating to the sufficiency of the signatures to put Proposition 1 on the ballot are thus not before the court at this time.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Airport, (3) is preempted by federal labor and aviation laws, and (4) violates the dormant commerce clause.[2]

Filo Foods moved for summary judgment on these challenges, and the trial court granted the motion in part and denied it in part. First, the trial court determined that Proposition 1 did not violate the single-subject rule. Second, the trial court held that Proposition 1 violates a state law that gives the Port of Seattle jurisdiction over the Seattle-Tacoma International Airport and thus could not be enforced at the airport. Third, the trial court held that federal labor law preempts Proposition 1's antiretaliation provision, but that federal law did not otherwise preempt Proposition 1. Finally, the trial court held that Proposition 1 did not violate the dormant commerce clause. The Committee and the City sought direct discretionary review, and Filo Foods sought cross review. We granted review and designated the Port of Seattle as a respondent.

## ANALYSIS

We review a trial court's grant of summary judgment de novo. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). Summary judgment is

---

[2] Filo Foods also alleged that Proposition 1 was invalid because it involves administrative rather than legislative matters, conflicts with standing requirements, and violates the subject-in-title rule. The trial court rejected these challenges. Filo Foods ultimately sought cross review of all rulings against it, but neither it nor the Port of Seattle present arguments relating to the subject-in-title rule, third-party standing doctrine, or the administrative nature of Proposition 1. These issues are therefore regarded as abandoned.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).[3]

Filo Foods challenges the validity of Proposition 1 on several grounds. First, Filo Foods argues that Proposition 1 is procedurally invalid in its entirety because it violates the single-subject rule. We hold that Proposition 1 does not violate the single-subject rule. Second, Filo Foods contends that under state law, Proposition 1 may not be applied at the Seattle-Tacoma International Airport. We conclude that Proposition 1 can be applied at the airport because there is no indication that it will interfere with airport operations. Third, Filo Foods argues that federal law preempts Proposition 1, in whole or, alternatively, in part. We conclude federal law does not preempt Proposition 1 in whole or in part. Finally, Filo Foods argues that Proposition 1 violates the dormant commerce clause; we conclude that it does not. Thus, we find Proposition 1 valid in its entirety.

*I.   Single-Subject Challenge*

RCW 35A.12.130 provides in relevant part that "[n]o ordinance shall contain more than one subject and that must be clearly expressed in its title." While no judicial opinion has interpreted this statutory language, the parties agree that it

---

[3] The parties dispute whether the proceeding before the superior court was a summary judgment disposition or a bench trial that ended in a declaratory judgment. We conclude that it was a summary judgment disposition. At the hearing, the trial court made clear it was relying on the declarations submitted by various parties but not resolving factual disputes as to the consequences of Proposition 1 on airport operations.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

appears to be an extension of article II, section 19 of our state constitution. We therefore consider our cases interpreting that constitutional provision.

In determining whether a bill, ordinance, or initiative relates to one general subject or multiple specific subjects, Washington courts look to the provision's title for guidance. When classifying an initiative to the people (as opposed to an initiative to the legislative body), the operative title is the ballot title because "'it is the ballot title with which voters are faced in the voting booth.'" *Wash. Citizens Action of Wash. v. State*, 162 Wn.2d 142, 154, 171 P.3d 486 (2007) (quoting *Wash. Fed'n of State Emps. v. State*, 127 Wn.2d 544, 555, 901 P.2d 1028 (1995)). Contrary to the Committee's contention, the ballot title includes more than the first sentence of the ballot description. It "consists of a statement of the subject of the measure, a concise description of the measure, and the question of whether or not the measure should be enacted into law." *Wash. Ass'n for Substance Abuse & Violence Prevention v. State*, 174 Wn.2d 642, 655, 278 P.3d 632 (2012).[4]

A ballot title may be general or restrictive. When a ballot title "suggests a general, overarching subject matter for the initiative," *Wash. Ass'n of Neigh. Stores v. State*, 149 Wn.2d 359, 369, 70 P.3d 920 (2003), it is considered to be general and "'great liberality will be indulged to hold that any subject reasonably germane to such

---

[4] To the extent our analysis in *Washington Ass'n of Neighborhood Stores v. State*, 149 Wn.2d 359, 368-69, 70 P.3d 920 (2003), suggested the operative title is limited to the first sentence of a ballot measure, this suggestion has since been foreclosed. *See Wash. Ass'n for Substance Abuse & Violence Prevention*, 174 Wn.2d at 655.

title may be embraced,'" *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 207, 11 P.3d 762 (2000) (quoting *DeCano v. State*, 7 Wn.2d 613, 627, 110 P.2d 627 (1941)). Only rational unity among the matters need exist. *City of Burien v. Kiga*, 144 Wn.2d 819, 825-26, 31 P.3d 659 (2001). Rational unity exists when the matters within the body of the initiative are germane to the general title and to one another. *Id.* at 826. In contrast, a title is considered restrictive "'where a particular part or branch of a subject is carved out and selected as the subject of the legislation.'" *State v. Broadaway*, 133 Wn.2d 118, 127, 942 P.2d 363 (1997) (quoting *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 23, 211 P.2d 651 (1949)). In other words, a restrictive title is narrow as opposed to broad, specific rather than generic. *Id.* Restrictive titles are not given the same liberal construction as general titles; laws with restrictive titles fail if their substantive provisions do not fall "'fairly within'" the restrictive language. *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 633, 71 P.3d 644 (2003) (quoting *State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 32 Wn.2d 13, 26, 200 P.2d 467 (1948)).

Here, the ballot title to Proposition 1 stated:

Proposition No. 1 concerns labor standards for certain employers.

This Ordinance requires certain hospitality and transportation employers to pay specified employees a $15.00 hourly minimum wage, adjusted annually for inflation, and pay sick and safe time of 1 hour per 40 hours worked. Tips shall be retained by workers who performed the services. Employers must offer additional hours to existing part-time employees before hiring from the outside. SeaTac must establish auditing

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

procedures to monitor and ensure compliance. Other labor standards are established.

Should this Ordinance be enacted into law?

*King County Official Local Voters' Pamphlet, General and Special Election* 94 (Nov. 5, 2013). "Other labor standards" includes a 90-day retention policy on successor employers after a business acquisition or merger. SEATAC MUNICIPAL CODE 7.45.060. The trial court upheld Proposition 1 against Filo Foods's single-subject challenge. We affirm in this respect.

We agree with the trial court that the breadth of topics covered by Proposition 1 and the structure of its title are not appreciably different from the scope and structure of an initiative we recently upheld in *Washington Ass'n for Substance Abuse & Violence Prevention*. 174 Wn.2d at 665. The ballot title in that case indicated:

> "Initiative Measure No. 1183 concerns liquor: beer, wine, and spirits (hard liquor).
>
> "This measure would close state liquor stores and sell their assets; license private parties to sell and distribute spirits; set license fees based on sales; regulate licensees; and change regulation of wine distribution.
>
> "Should this measure be enacted into law?"

*Id.* at 647 (quoting *State of Washington Voters' Pamphlet, General Election* 19 (Nov. 8, 2011)). In addition to these specific provisions, the measure earmarked a portion of revenue raised from liquor license fees for the funding of public safety programs, including police, fire, and emergency services. *Id.* at 650. Like the structure of

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Proposition 1, Initiative Measure No. 1183 indicated a general topic and then listed some but not all of its substantive measures. Despite these more specific details, we found the title was general, pertaining "to the broad subject of liquor." *Id.* at 655. And, although the public safety earmark's connection with the measure's liquor privatization provisions was arguably tenuous, we found the earmark to be germane to liquor privatization given the enforcement burdens the measure places on local governments, and given the legislature's past recognition of the relationship between liquor regulation and public welfare. *Id.* at 657-58.

We similarly find that Proposition 1 satisfies the single-subject rule. Although the title lists various provisions, it also states that Proposition 1 generally "concerns labor standards for certain employers." *King County Official Local Voters' Pamphlet, General and Special Election* 94 (Nov. 5, 2013). This language is sufficiently broad to place voters on notice of its contents, including the 90-day worker-retention policy imposed on successor employers. The retention policy concerns labor standards and is reasonably germane to the establishment of minimum employee benefits, including job security. Proposition 1 survives the single-subject challenge. Moving to the substance of Proposition 1, we next consider whether it can be validly enforced at the Seattle-Tacoma International Airport under state law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## II.   *Application at the Seattle-Tacoma International Airport*

The trial court ruled that Proposition 1 could not be applied at the Seattle-Tacoma International Airport because it would conflict with the Port of Seattle's jurisdiction over the airport under RCW 14.08.330.  But we must try to harmonize municipal ordinances with state law when possible; we will invalidate an ordinance only if it "'directly and irreconcilably conflicts'" with state law.  *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 564, 29 P.3d 709 (2001) (quoting *Brown v. City of Yakima*, 116 Wn.2d 556, 561, 807 P.2d 353 (1991)).  Based on our analysis of the statutory language, our prior case law, and the functional differences between cities and special purpose districts, we conclude that Proposition 1 can be harmonized with RCW 14.08.330 because the Port of Seattle does not show that Proposition 1 would interfere with airport operations.  Therefore, we hold that Proposition 1 can be applied at the Seattle-Tacoma International Airport.

Statutory interpretation presents a question of law that we review de novo.  *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005).  When interpreting statutes, our goal is to effectuate the legislature's intent.  *Id.*  If the statute's meaning is plain, we give effect to that meaning as the expression of the legislature's intent.  *Id.*  Plain meaning is determined from the statute as a whole; we consider the ordinary meaning of the language used in the context of the entire statute, related statutory provisions, and the statutory scheme from which the language appears.  *Id.*  If the

statutory language is susceptible to more than one reasonable interpretation, it is ambiguous, and we may "'resort to extrinsic aids, such as legislative history,'" to resolve the ambiguity. *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005) (quoting *Biggs v. Vail*, 119 Wn.2d 129, 134, 830 P.2d 350 (1992)).

At issue in this case is whether Proposition 1 directly and irreconcilably conflicts with RCW 14.08.330, the statute that gives special purpose districts (such as the Port of Seattle) jurisdiction over airports. The statute provides:

> Every airport and other air navigation facility controlled and operated by any municipality, or jointly controlled and operated pursuant to the provisions of this chapter, shall, subject to federal and state laws, rules, and regulations, be under the exclusive jurisdiction and control of the municipality or municipalities controlling and operating it. The municipality or municipalities shall have concurrent jurisdiction over the adjacent territory described in RCW 14.08.120(2). No other municipality in which the airport or air navigation facility is located shall have any police jurisdiction of the same or any authority to charge or exact any license fees or occupation taxes for the operations. However, by agreement with the municipality operating and controlling the airport or air navigation facility, a municipality in which an airport or air navigation facility is located may be responsible for the administration and enforcement of the uniform fire code, as adopted by that municipality under RCW 19.27.040, on that portion of any airport or air navigation facility located within its jurisdictional boundaries.

RCW 14.08.330.

Thus, the first question is whether the meaning of this statute is plain on its face or whether it is ambiguous. The Port of Seattle contends that the statute is plain on its face. We do not agree. Reading RCW 14.08.330 as a whole, we find the statute's "exclusive jurisdiction and control" language ambiguous. The statute provides that

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

every airport controlled by a municipality "shall . . . be under the exclusive jurisdiction and control of the municipality . . . controlling and operating it." *Id.* But the statute continues, "No other municipality in which the airport . . . is located shall have any police jurisdiction of the same or any authority to charge or exact any license fees or occupation taxes for the operations." *Id.* The Port of Seattle contends that the "exclusive jurisdiction" language means the Port of Seattle has the sole and undivided authority to regulate any matter that occurs at the Seattle-Tacoma International Airport. It contends, "The City does not have the statutory authority to regulate *any matters* occurring at [the Seattle-Tacoma International Airport]." Br. of Resp't Port of Seattle at 9 (emphasis added). However, reading the statute's two sentences together, it is unclear what the legislature intended to grant the Port of Seattle "exclusive jurisdiction and control" over. The statute does not say "any matters." *See* RCW 14.08.330. If the legislature meant for the Port of Seattle to have "exclusive jurisdiction and control" over every conceivable matter that occurred at the airport, then the statute's subsequent sentence, detailing that "[n]o other municipality in which the airport . . . is located shall have any police jurisdiction of the same or any authority to charge or exact any license fees or occupation taxes for the operations," would be superfluous. "'[N]o part of a statute should be deemed inoperative or superfluous unless it is the result of obvious mistake or error.'" *In re Det. of Strand*, 167 Wn.2d 180, 189, 217 P.3d 1159 (2009) (quoting *Klein v. Pyrodyne Corp.*, 117

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Wn.2d 1, 13, 810 P.2d 917, 817 P.2d 1359 (1991)). By saying that municipalities in which airports are located may not charge license fees or occupation taxes, the legislature implied that there are matters that municipalities *can* regulate. Since the statute is unclear regarding what exactly the legislature intended to grant the Port of Seattle "exclusive jurisdiction and control" over, we find the statute ambiguous.

Our task, then, is to determine the legislature's intent. *Jacobs*, 154 Wn.2d at 600. The city of SeaTac contends that the legislature intended to give the Port of Seattle jurisdiction over only airport operations, whereas the Port of Seattle contends that the legislature intended to prohibit any city of SeaTac law or regulation from applying at the Seattle-Tacoma International Airport. As described below, we reject the Port of Seattle's interpretation because we find it, among other things, incompatible with a special purpose district's limited powers.

Unlike cities, which are granted "the broadest powers of local self-government," RCW 35A.01.010, a port district is a special purpose district, which "is limited in its powers to those necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation." *Port of Seattle v. Wash. Utils. & Transp. Comm'n*, 92 Wn.2d 789, 794-95, 597 P.2d 383 (1979).

The legislature granted powers to municipalities that establish or acquire airports in RCW 14.08.120. Among these powers is the power "[t]o adopt and amend

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

all needed rules, regulations, and ordinances for the management, government, and use of any properties under [the municipality's] control" and "to fix by ordinance or resolution . . . penalties for the violation of the rules, regulations, and ordinances, and enforce those penalties in the same manner in which penalties prescribed by other rules, regulations, and ordinances of the municipality are enforced." RCW 14.08.120(2).

The Port of Seattle asks us to interpret this statute, in combination with RCW 14.08.330's grant of "exclusive jurisdiction," as a law that strips the city of SeaTac of all police power—that is, all of its normal authority to regulate in the interests of public health and safety—at the airport. But RCW 14.08.120(2) contemplates a municipality using its normal rule-making authority and procedures to enact and enforce airport-specific rules, and the Port of Seattle's normal authority does not include the exercise of general police powers. Outside the airport context, a port district's rule-making authority is subordinate to the authority of the municipality within which it is situated. RCW 53.08.220(1). While any port district "may formulate all needful regulations for the use . . . of any properties or facilities owned or operated by it," those regulations "must conform to and be consistent with the ordinances of the city or town" in which the district is located. *Id.*

This statutory scheme reflects a fundamental difference between the powers of a special purpose district, like the Port of Seattle, and those of a city, town, or county.

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

To interpret RCW 14.08.120 and .330 in the manner the Port of Seattle suggests, we would have to conclude that the legislature intended the Revised Airports Act, chapter 14.08 RCW, to deprive the city of SeaTac of all its police powers at the airport, even though the Port of Seattle lacks the authority to fill this regulatory gap through its normal rule-making authority. We decline to interpret the Revised Airports Act so broadly.

Although the language of RCW 14.08.330 plainly denies the city of SeaTac some authority, the overall statutory scheme and the purposes underlying the Revised Airports Act suggest that RCW 14.08.330 denies the city of SeaTac authority over *airport operations and the subject of aeronautics*, as opposed to "*any matters occurring at [the Seattle-Tacoma International Airport]*." Br. of Resp't Port of Seattle at 9 (emphasis added).

The legislature expressly instructed that the purpose of the statutory scheme is to ensure uniformity *in the laws regarding aeronautics*. RCW 14.08.340. Additionally, the law detailing the specific powers of municipalities operating airports, RCW 14.08.120(1), provides that a municipality may establish a board responsible for "the construction, enlargement, improvement, maintenance, equipment, operation, and regulation [of the airport or other air navigation facility]." These aspects of the statutory scheme lead us to conclude that the legislature intended to vest authority for the *operation* of the airport exclusively with the Port of Seattle,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

but not to prohibit a local municipality like the city of SeaTac from regulating for the general welfare in a manner unrelated to airport operations.

Our interpretation is supported by our case law indicating that the purpose of the statutory scheme is to preclude local municipalities "from interfering with respect to the operation of the Seattle-Tacoma airport." *King County v. Port of Seattle*, 37 Wn.2d 338, 348, 223 P.2d 834 (1950) (addressing whether local municipalities can impose license fees). In that case, we considered a separate—but related—issue: whether King County could impose a licensing fee on taxicabs operating at the Seattle-Tacoma International Airport. We looked to the statute's specific limitation regarding the ability of local municipalities to impose license fees and held that King County could not impose a fee because the statute provides that "*no other municipality* in which such airport or air navigation facility [is located] shall have any police jurisdiction of the same or *any authority to charge or exact any license fees.*" *Id.* at 346-47 (alteration in original) (quoting REM. REV. STAT. § 2722-44 (Supp. 1945) (codified as amended at RCW 14.08.330)). We explained that "[t]he effect of this section, when read in the light of the entire revised airports act, is *merely to preclude* [*King County*] *from interfering with respect to the operation of the Seattle-Tacoma airport* and forbids [King County from] exacting any license fees." *Id.* at 348 (emphasis added).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

While that case was focused on the more specific limitation on license fees, this language represents a commonsense interpretation of the legislature's intent, particularly its grant of jurisdiction. Looking at the statutory scheme overall, we conclude that the legislature intended to give the Port of Seattle exclusive jurisdiction over the *operation* of the Seattle-Tacoma International Airport: specifically "the construction, enlargement, improvement, maintenance, equipment, operation, and regulation" of the airport. RCW 14.08.120(1). Here, Proposition 1 has nothing to do with airport operations or the subject of aeronautics. In addition, the Port of Seattle does not show that Proposition 1 would interfere with airport operations. As a result, we conclude that Proposition 1 can be enforced at the Seattle-Tacoma International Airport without violating RCW 14.08.330.

The dissent asserts that the provision of RCW 14.08.330 related to the administration and enforcement of local fire codes "disproves" our interpretation of the statute. Dissent at 6. It asserts that "[i]f the legislature intended the operating municipality's exclusive jurisdiction to be over only [airport operations], why would the legislature specify an exception from the operating municipality's exclusive jurisdiction to allow the municipality in which the airport sits to enforce a *fire code* at the airport?" *Id.* at 6-7. The legislative history of the fire code amendment answers the dissent's question. The house committee in support of the bill testified, "Seattle has been enforcing its uniform fire code on the portion of the King County airport

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

located within its boundaries, but their attorney feels they may not have this authority. . . . This bill clarifies an ambiguity in current law." H.B. REPORT ON H.B. 139, 49th Leg., Reg. Sess. (Wash. 1985). That language shows that the legislature added the fire code language because it recognized that the statute's ambiguous language called into question Seattle's ability to enforce the uniform fire code. By adding in the language, it "clarifie[d] an ambiguity."[5] *Id.* Rather than disproving our interpretation, the house bill reinforces our conclusion that the statute's language is ambiguous.

Our interpretation is further supported by the portion of RCW 14.08.330 that incorporates other state laws, including the Washington Minimum Wage Act, chapter 49.46 RCW. To the extent the Port of Seattle's jurisdiction over the Seattle-Tacoma International Airport is "exclusive," its jurisdiction is still "subject to . . . state laws, rules, and regulations." RCW 14.08.330. As we have said before, that clause subordinates the Port of Seattle's authority over the airport to applicable state law. *Port of Seattle*, 92 Wn.2d at 804. One applicable state law that we must consider is RCW 49.46.120, part of the Washington Minimum Wage Act. That statute provides:

> Any standards relating to wages, hours, or other working conditions established by any applicable federal, state, *or local law or ordinance* . . . which are more favorable to employees than the minimum standards applicable under this chapter . . . *shall be in full force and effect.*

---

[5] Unfortunately, while the legislature recognized that the existing statute was ambiguous, it chose to clarify only the provision related to the fire code. The ambiguity with regard to other municipal laws remains.

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

RCW 49.46.120 (emphasis added). Thus, state law sets the minimum wage in any given location at the most favorable level to the employee whether by federal, state, or local law. No party argues that the Port of Seattle is exempt from our state minimum wage law. The Port of Seattle's regulatory authority over the airport is subordinate to all state laws, including the state minimum wage law, that require it to comply with local minimum wage laws.

This argument regarding the Washington Minimum Wage Act was first advanced by the Washington State attorney general as amicus to this court, and Filo Foods argues that we may not consider new arguments raised only by an amicus. This misunderstands this court's authority; while we generally decline to reach issues not properly presented by the parties, "this court has inherent authority to consider issues not raised by the parties if necessary to reach a proper decision." *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988) (citing *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972)). This is especially true in a case such as this where we are tasked with interpreting a statute. We read statutes together to achieve a "'harmonious total statutory scheme . . . which maintains the integrity of the respective statutes.'" *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 588, 192 P.3d 306 (2008) (alteration in original) (internal quotation marks omitted) (quoting *State ex rel. Peninsula Neigh. Ass'n v. Dep't of Transp.*, 142 Wn.2d

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

328, 342, 12 P.3d 134 (2000)). That is because "[t]his court assumes the legislature does not intend to create inconsistent statutes." *Id.*

Under Filo Foods's reading, the two statutes would be inconsistent with one another. RCW 49.46.120 mandates that the laws in any given location most favorable to the employee shall be in full force and effect. That provision would be meaningless if the Port of Seattle could trump such laws in airports it controls. RCW 49.46.120 does not carve out an exception for airports, and RCW 14.08.330 does not contain any language indicating that the Port of Seattle's jurisdiction and control over the airport includes the power to trump local minimum wage laws. As stated above, that provision precludes the city of SeaTac only from interfering with the operations of an airport. The ordinance does not do so.

"Municipal ordinances are presumed to be valid." *Heinsma*, 144 Wn.2d at 561. We must try to harmonize municipal ordinances with state law when possible; we will invalidate an ordinance only if it "'directly and irreconcilably conflicts'" with state law. *Id.* at 564 (quoting *Brown*, 116 Wn.2d at 561). In this case, we hold that Proposition 1 can be harmonized with RCW 14.08.330 as a matter of law. Absent a factual showing that Proposition 1 would interfere with airport operations, the proposition does not conflict with the Port of Seattle's jurisdiction or ability to operate the Seattle-Tacoma International Airport. Therefore, Proposition 1 can be validly enforced at the Seattle-Tacoma International Airport.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

### III. Federal Preemption

Separate from challenging the jurisdictional reach of Proposition 1, Filo Foods challenges its substantive provisions on federal preemption grounds. It contends that three federal statutes preempt Proposition 1: the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169; the Airline Deregulation Act of 1978 (ADA), Pub. L. No. 95-504, 92 Stat. 1705 (1978) (codified as amended in scattered sections of 49 U.S.C.); and the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188. We hold that none of those statutes preempt Proposition 1. We will address each statute in turn.

### A. The NLRA Does Not Preempt Proposition 1

Filo Foods contends that the NLRA preempts Proposition 1 in its entirety, or at least specifically preempts Proposition 1's worker-retention provision and its antiretaliation provision, SEATAC MUNICIPAL CODE 7.45.060, .090. The trial court held that the NLRA does not preempt Proposition 1 entirely but does preempt the antiretaliation provision. We hold that the NLRA does not preempt any aspect of Proposition 1.

Two provisions in the NLRA establish substantive rights and prohibitions. Section 7 protects an employee's right to organize and bargain collectively and to refrain from doing so. 29 U.S.C. § 157. Section 8 prohibits certain "[u]nfair labor practice[s]" of employers and labor organizations. 29 U.S.C. § 158. The NLRA does not have a preemption clause, but the United States Supreme Court has developed

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

case law concerning when the NLRA preempts state and local laws. The Court recognizes two forms of NLRA preemption: *Garmon* preemption and *Machinists* preemption. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976).

Under the *Garmon* preemption doctrine, the NLRA's text may affirmatively conflict with and thus preempt a state or local law. "*Garmon* pre-emption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65, 128 S. Ct. 2408, 171 L. Ed. 2d 264 (2008) (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 89 L. Ed. 2d 223 (1986)). By contrast, under the *Machinists* preemption doctrine, the NLRA's text need not affirmatively conflict with a state or local law, but rather the United States Supreme Court has held that the NLRA's structure implies that Congress intended certain aspects of labor relations to remain unregulated. That is, preemption under *Machinists* "forbids . . . States to regulate conduct that Congress intended 'be unregulated [and] left "to be controlled by the free play of economic forces."'" *Id.* (quoting *Machinists*, 427 U.S. at 140 (quoting *Nat'l Labor Relations Bd. v. Nash-Finch Co.*, 404 U.S. 138, 144, 92 S. Ct. 373, 30 L. Ed. 2d 328 (1971))). "*Machinists*

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

pre-emption is based on the premise that "'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'"" *Id.* (quoting *Machinists*, 427 U.S. at 140 n.4 (quoting Archibald Cox, *Labor Law Preemption Revisited*, 85 HARV. L. REV. 1337, 1352 (1972))).

Filo Foods first argues that under the *Machinists* doctrine, the NLRA preempts Proposition 1 in its entirety. Filo Foods contends that because Proposition 1 "imposes onerous substantive requirements" that all "favor employees and are typically issues negotiated in a collective bargaining agreement[,] [m]andating [the substantive labor requirements] runs afoul of federal labor policy." Am. Answering Br. & Opening Cross-Appeal Br. of Filo Foods (Filo Foods's Opening Br.) at 33-34.

The United States Supreme Court has rejected this type of argument. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 19-23, 107 S. Ct. 2211, 96 L. Ed. 2d 1 (1987); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747-58, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985). In *Fort Halifax Packing Co.*, for example, a Maine statute required employers to provide a onetime severance payment to employees in the event of a plant closing. 482 U.S. at 3-4 & n.1. An employer challenged the statute, arguing, as Filo Foods argues here, that the statute "intrudes on the bargaining activities of the parties because the prospect of a statutory obligation undercuts an

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

employer's ability to withstand a union's demand for severance pay." *Id.* at 20. The

Court rejected this argument, holding that

> the NLRA is concerned with ensuring an equitable bargaining process,
> not with the substantive terms that may emerge from such bargaining.
> "The evil Congress was addressing thus was entirely unrelated to local
> or federal regulation establishing minimum terms of employment." Such
> regulation provides protections to individual union and nonunion
> workers alike, and thus "neither encourage[s] nor discourage[s] the
> collective-bargaining processes that are the subject of the NLRA."
> Furthermore, pre-emption should not be lightly inferred in this area,
> since the establishment of labor standards falls within the traditional
> police power of the State. . . . It is true that the Maine statute gives
> employees something for which they otherwise might have to bargain.
> That is true, however, with regard to any state law that substantively
> regulates employment conditions. Both employers and employees come
> to the bargaining table with rights under state law that form a "backdrop"
> for their negotiations. . . . [T]he mere fact that a state statute pertains to
> matters over which the parties are free to bargain cannot support a claim
> of pre-emption, for "there is nothing in the NLRA . . . which expressly
> forecloses all state regulatory power with respect to those issues . . . that
> may be the subject of collective bargaining."

*Id.* at 20-22 (some alterations in original) (citations and internal quotation marks

omitted) (quoting *Metro. Life Ins. Co.*, 471 U.S. at 754-55; *Malone v. White Motor*

*Corp.*, 435 U.S. 497, 504-05, 98 S. Ct. 1185, 55 L. Ed. 2d 443 (1978)). We similarly

conclude that Proposition 1, which establishes a minimum wage and other employee

protections, "is not pre-empted by the NLRA, since its establishment of a minimum

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

labor standard does not impermissibly intrude upon the collective-bargaining process." *Id.* at 23.[6]

Filo Foods further argues that Proposition 1 is not a permissible minimum labor standard because of its waive-out provision. The waive-out provision permits employers and employees to agree to waive Proposition 1's substantive requirements, but only "in a bona fide collective bargaining agreement." SEATAC MUNICIPAL CODE 7.45.080. This, Filo Foods contends, "upsets the balance of power between labor and management by placing non-union employers in positions where they will be required to recognize unions in order to avoid the Ordinance." Filo Foods's Opening Br. at 37. Yet again, in *Fort Halifax Packing Co.*, the United States Supreme Court considered and rejected this argument:

> Appellant maintains that this case is distinguishable from *Metropolitan Life*. It points out that, unlike *Metropolitan Life*, the

---

[6] Filo Foods suggests that even if some of Proposition 1's provisions are in fact minimum labor standards that are not individually preempted, the trial court erred by "fail[ing] to consider the cumulative effect" of the minimum labor standards. Filo Foods's Opening Br. at 37. Filo Foods cites no authority for the proposition that several minimum labor standards, though each in isolation is not preempted, work together in cumulative effect to become preempted. Without such authority, *Fort Halifax Packing Co.* and *Metropolitan Life Insurance Co.* require us to hold that the NLRA does not preempt minimum labor standards, even when several such standards appear in one ordinance. Filo Foods also suggests that the NLRA preempts Proposition 1 because it is not a law "of general application and instead, targets those businesses, and only those businesses, that are associated, either directly or indirectly, with air travel." Filo Foods's Opening Br. at 38. Such an argument is unavailing: "state substantive labor standards, including minimum wages, are not invalid [under the NLRA] simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." *Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

statutory obligation at issue here is optional, since it applies only in the absence of an agreement between employer and employees. Therefore, the Company argues, the Maine law cannot be regarded as establishing a genuine minimum labor standard. The fact that the parties are free to devise their own severance pay arrangements, however, strengthens the case that the statute works no intrusion on collective bargaining. . . . If a statute that permits *no* collective bargaining on a subject escapes NLRA pre-emption, see *Metropolitan Life*, surely one that permits such bargaining cannot be pre-empted.

482 U.S. at 22; *see also Livadas v. Bradshaw*, 512 U.S. 107, 131-32 & n.26, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994) (holding that the NLRA "cast[s] no shadow on the validity" of an opt-out provision for minimum labor standards). Consistent with United States Supreme Court authority, we hold Proposition 1 is not preempted because of its waiver provision.

Next, Filo Foods argues that the NLRA preempts Proposition 1 in its entirety because labor organizations used the political process to achieve rights that they may have otherwise achieved through collective bargaining. It contends, "Where unions have tried to obtain certain conditions through collective bargaining and have failed to do so effectively, a political body . . . should not reach a solution for them." Filo Foods's Opening Br. at 35-36. We reject this argument. Even putting aside the labor organizations' rights of petition and of political expression under the First Amendment to the United States Constitution, the United States Supreme Court has held that section 7 of the NLRA itself protects labor organizations' right to seek substantive protection through the political process. *Eastex, Inc. v. Nat'l Labor*

26

*Relations Bd.*, 437 U.S. 556, 565-66, 98 S. Ct. 2505, 57 L. Ed. 2d 428 (1978) (holding that "employees' appeals to legislators to protect their interests as employees are within the scope" of the employees' right under section 7 of the NLRA to engage in "'mutual aid or protection'"). We hold that the NLRA does not preempt Proposition 1 in its entirety.

We turn now to Filo Foods's preemption challenges to specific provisions of Proposition 1. Filo Foods first argues that under the *Machinists* doctrine, the NLRA preempts Proposition 1's worker-retention provision. SEATAC MUNICIPAL CODE 7.45.060. This provision applies to "successor employer[s]," *id.*, which appears to mean the surviving company after a business acquisition or merger.[7] Under SeaTac Municipal Code 7.45.060, successor employers have duties to retain certain workers of the predecessor employer for a limited period of time:

> B. Retention Offer. Except as otherwise provided herein, the successor employer shall offer employment to all qualified retention employees. A successor employer who is a hospitality employer shall, before hiring off the street or transferring workers from elsewhere, offer employment to all qualified retention employees of any predecessor employer that has provided similar services at the same facility. If the successor employer does not have enough positions available for all qualified retention employees, the successor employer shall hire the retention employees by seniority within each job classification. For any additional positions which become available during the initial ninety (90) day period of the

---

[7] A *"Successor Employer"* is "the new hospitality or transportation employer that succeeds the predecessor employer in the provision of substantially similar services within the City," and a *"Predecessor Employer"* is "the hospitality or transportation employer that provided substantially similar services within the City prior to the successor employer." SEATAC MUNICIPAL CODE 7.45.010(L), (I) (emphasis added).

27

new contract, the successor employer will hire qualified retention employees by seniority within each job classification.

C. Retention Period. A successor employer shall not discharge a retention employee without just cause during the initial ninety (90) day period of his/her employment.

SEATAC MUNICIPAL CODE 7.45.060. The trial court held that the NLRA does not preempt these provisions. We affirm the trial court in this respect.

Filo Foods argues that Proposition 1's worker-retention provisions are preempted under the *Machinists* doctrine because the "U.S. Supreme Court recognizes a successor employer's right to operate its business in the manner in which it best sees fit" in terms of its hiring and firing decisions. Filo Foods's Opening Br. at 40. But the United States Supreme Court cases Filo Foods relies on do not support its argument. These cases involved application of the National Labor Relation Board's (NLRB) successorship doctrine, which holds that if, under the doctrine's fact-intensive case law, the employer is found to be a successor, then the employer has a duty to bargain with the predecessor's union. *See Nat'l Labor Relations Bd. v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S. Ct. 1571, 32 L. Ed. 2d 61 (1972); *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union*, 417 U.S. 249, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974); *Fall River Dyeing & Finishing Corp. v. Nat'l Labor Relations Bd.*, 482 U.S. 27, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987). None addressed *Machinists* preemption or held that temporary worker-

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

retention was a subject matter Congress intended to leave unregulated. The cases are not particularly instructive to the issue at hand.[8]

Rather than being preempted under *Machinists*, we believe Proposition 1's worker-retention provision fits comfortably within the category of minimum labor standards held to be valid under *Fort Halifax Packing Co.* and *Metropolitan Life Insurance Co.* Just as the state of Maine could require certain employers to provide severance pay to employees upon their businesses closing, in *Fort Halifax Packing Co.*, the city of SeaTac may require successor employers to retain for three months (1) "qualified" retention employees, (2) to the extent that there are "enough positions available for all qualified retention employees," (3) unless there is "just cause" for termination. SEATAC MUNICIPAL CODE 7.45.060(B), (C). Indeed, as section 7.45.060's qualifications illustrate, a successor employer in the city of SeaTac has substantial flexibility in avoiding the three-month retention period. We hold that

---

[8] Filo Foods also argues that the provisions impose on an employer "a duty to bargain that would not necessarily arise in the free market." Filo Foods's Opening Br. at 42. We disagree. By its terms, Proposition 1 does not impose on a successor employer the duty to bargain with employees after the three-month period elapses. Nor is there reason to think that requiring an employer to retain employees for 90 days would in and of itself trigger successor status under the NLRB's successorship doctrine (which would thereby trigger the duty to bargain with the purchased company's union). Instead, the successorship doctrine focuses in part on the acquiring company's conscious decision to retain the purchased company's employees in order to find successor status. *See Fall River Dyeing & Finishing Corp.*, 482 U.S. at 41 ("If the new employer *makes a conscious decision* to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor." (first emphasis added)).

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

SeaTac Municipal Code 7.45.060 is a minimum labor standard that simply sets the

"backdrop" against which labor negotiations proceed. *See R.I. Hospitality Ass'n v.*

*City of Providence*, 667 F.3d 17, 32 (1st Cir. 2011) (upholding a worker-retention

ordinance similar to SeaTac Municipal Code 7.45.060 against a *Machinists*

preemption challenge) (quoting *Fort Halifax Packing Co.*, 482 U.S. at 21).

Accordingly, it is not preempted under the *Machinists* doctrine.

Filo Foods next argues that under the *Garmon* doctrine, the NLRA preempts

Proposition 1's antiretaliation provision, SeaTac Municipal Code 7.45.090. That

provision states:

> A. It shall be a violation for a hospitality employer or transportation employer or any other person to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right protected under this chapter.
>
> B. It shall be a violation for a hospitality employer or transportation employer to take adverse action or to discriminate against a covered worker because the covered worker has exercised in good faith the rights protected under this chapter.

SEATAC MUNICIPAL CODE 7.45.090. The trial court determined the NLRA preempts

these provisions insofar as they create a "'supplemental sanction for violations of the

NLRA.'" Clerk's Papers at 1961. The court reasoned that "[t]hese provisions of the

Ordinance directly infringe on the NLRB's exclusive jurisdiction under §8 of the

NLRA, which already makes it an unfair labor practice for an employer 'to interfere

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

with, restrain, or coerce employees in the exercise of the rights guaranteed in' §7." *Id.* (quoting 29 U.S.C. § 158(a)(1); NLRA § 8(a)(1)). We reverse in this respect.

The NLRA does indeed preempt state or local laws that create supplemental sanctions for violations of the NLRA. "[T]he *Garmon* rule prevents States . . . from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Gould Inc.*, 475 U.S. at 286. For example, in *Gould Inc.*, the United States Supreme Court held that a Wisconsin statute that prohibited businesses that were repeat violators of the NLRA from doing business in Wisconsin was a supplemental sanction for violation of the NLRA and was therefore preempted. *Id.* at 283. Proposition 1 creates no such supplemental sanction for violations of the NLRA. Rather than providing an employee a remedy for illegal retaliation for exercising rights protected under the NLRA, Proposition 1 provides an employee a remedy for illegal retaliation for exercising rights protected under Proposition 1. The two are not the same. Proposition 1 is self-contained. If an employer takes an adverse action against an employee because the employee reported a minimum wage violation under Proposition 1, the employer violates Proposition 1's antiretaliation provision. But in this scenario, the employer does not necessarily violate the NLRA's antiretaliation provision nor become subject to a new sanction for a NLRA violation. Proposition 1's antiretaliation provision is thus not a supplemental sanction appended to the

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

NLRA but instead protects against retaliation for the exercise of rights under its provisions. We hold SeaTac Municipal Code 7.45.090 is not NLRA preempted.

### B. The RLA Does Not Preempt Proposition 1

The trial court did not analyze whether the RLA preempts Proposition 1 because it concluded that an RLA preemption analysis would be the same as an NLRA analysis, and it had already found that the NLRA did not preempt Proposition 1. Filo Foods, along with amicus Airlines for America, argue that the RLA and NLRA preemption analyses differ because the RLA requires industry-wide unions while the NLRA does not. It argues that this industry-wide union requirement usually makes it difficult for a group of employees at a single airport to unionize, and that in most cases a group of employees at a single airport would need their employer to voluntarily recognize them in order to have a legitimate union. Filo Foods contends that Proposition 1 forces employers to voluntarily recognize unions at SeaTac because the only way for an employer to get out of the ambit of Proposition 1 is to negotiate a collective bargaining agreement. However, Filo Foods's argument is essentially a reformulation of the argument we rejected in the NLRA context above—that Proposition 1 "upsets the balance of power between labor and management by placing non-union employers in positions where they will be required to recognize unions in order to avoid the Ordinance." Filo Foods's Opening Br. at 37. Like our conclusion

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

above, we hold that the RLA does not preempt Proposition 1 and we affirm the trial

court.

The RLA was originally designed to prevent labor disputes from hindering

interstate commerce in the railroad industry, and Congress extended the RLA to cover

the airline industry in 1936. 45 U.S.C. § 152; Act of Apr. 10, 1936, ch. 166, 49 Stat.

1189 (currently codified as 45 U.S.C. § 181). The act itself states that it is the duty of

both employers and employees in those industries to

> exert every reasonable effort to make and maintain agreements
> concerning rates of pay, rules, and working conditions, and to settle all
> disputes, whether arising out of the application of such agreements or
> otherwise, in order to avoid any interruption to commerce or to the
> operation of any carrier growing out of any dispute between the carrier
> and the employees therof.

45 U.S.C. § 152. The act generally promotes collective bargaining and "sets up a

mandatory arbitral mechanism to handle disputes 'growing out of grievances or out of

the interpretation or application of agreements concerning rates of pay, rules, or

working conditions.'" *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248, 114 S.

Ct. 2239, 129 L. Ed. 2d 203 (1994) (quoting 45 U.S.C. § 153(i)). The United States

Supreme Court articulated the government's role regarding the RLA as follows: "The

Railway Labor Act, like the National Labor Relations Act, does not undertake

governmental regulation of wages, hours, or working conditions. Instead it seeks to

provide a means by which agreement may be reached with respect to them."

*Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 6, 63 S. Ct.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

420, 87 L. Ed. 571 (1943) (footnote omitted). Although the RLA and NLRA are similar, one of the differences between the two acts, as Filo Foods notes, is that the RLA requires employees to collectively bargain on an industry-wide basis. *Summit Airlines, Inc. v. Teamsters Union Local No. 295*, 628 F.2d 787, 795 (2d Cir. 1980).

That minor difference notwithstanding, the RLA is like the NLRA for preemption purposes, in that "substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA." *Hawaiian Airlines*, 512 U.S. at 257. Thus, our preemption analysis is the same as above. We hold that Proposition 1, which establishes a minimum wage and other employee protections, is not preempted by the RLA. Therefore, we affirm the trial court.

### C. The ADA Does Not Preempt Proposition 1

The trial court did not analyze whether the ADA preempts Proposition 1 because it found that state law preempted Proposition 1 at the Seattle-Tacoma International Airport. Filo Foods argues that the ADA preempts Proposition 1 because Proposition 1 "has the force and effect of law related to air carrier services . . . and . . . 'prices' . . . by dictating how much carriers must pay for the workers who provide . . . services." Filo Foods's Opening Br. at 45. We hold that the ADA does not preempt Proposition 1 because Proposition 1 is not sufficiently "related to" airline services and prices.

34

Congress enacted the ADA in 1978, "determining that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality . . . of air transportation services.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) (alterations in original) (quoting former 49 U.S.C. App. §§ 1302(a)(4), (9), recodified as 49 U.S.C. §§ 40101(a)(6), (12)). The ADA contains a preemption provision to prevent States from undoing federal deregulation. 49 U.S.C. 41713(b)(1). Under that provision, states "may not enact or enforce a law . . . related to a price, route, or service of an air carrier." *Id.*

The United States Supreme Court has interpreted that preemption language broadly, holding that "[s]tate enforcement actions having a connection with, or reference to, airline 'rates, routes, or services' are pre-empted." *Morales*, 504 U.S. at 384 (quoting former 49 U.S.C. App. § 1305(a)(1), recodified as 49 U.S.C. § 41713(b)(1)[9]). Thus, even laws that affect rates indirectly could be preempted. *See id.* at 386. However, the Court noted that not all state laws will be preempted. "'[S]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* at 390 (alterations in original) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21, 103 S. Ct. 2890, 77 L. Ed. 2d 490

---

[9] Although Congress has amended the ADA since *Morales* by replacing the word "rates" with "prices," that change does not alter our analysis. *See* 49 U.S.C. § 41713(b)(1). Our conclusion regarding preemption is based on more recent circuit court cases, as analyzed below.

35

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(1983)). The Court in *Morales* did not draw the line for what state actions would be too tenuous to have preemptive effect.

Although preemption under the ADA is broad, federal circuit court cases suggest that the ADA does not preempt generally applicable laws that regulate how an airline behaves as an employer, even though the law indirectly affects the airline's prices and services. *See DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 87 (1st Cir. 2011); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998). In *DiFiore*, porters who provided curbside baggage service (called "'skycaps'") at Logan Airport in Massachusetts sued American Airlines over a $2-per-bag fee. 646 F.3d at 82-83. The skycaps contended that passengers stopped tipping them because the passengers assumed that the $2 fee was a mandatory tip rather than a charge paid to the airline. *Id.* The skycaps sued American Airlines under a Massachusetts statute governing tips, arguing that the law required the airline to give them any "'tip[s] or service charge[s]'" and that the bag fee constituted "a 'service charge' under state law (and must therefore go to the skycaps) because customers 'reasonably expect[ed]' it to be given to the skycaps." *Id.* at 84 (third alteration in original) (quoting MASS. GEN. LAWS ch. 149, § 152A(a), (b)). The First Circuit concluded that because the tip law had "a *direct connection* to air carrier prices and services," the ADA preempted it. *Id.* at 87. The court reasoned that if the airline wanted to avoid having the law "deem the curbside check-in fee a 'service

36

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

charge[,]' [it] would require changes in the way the service is provided or advertised." *Id.* at 88. The court recognized, though, that if the law merely regulated "how the airline behave[d] as an employer," the ADA would likely not preempt the law, even if the law indirectly affected fares and services. *Id.* at 87-88.

Likewise, in *Mendonca*, the Ninth Circuit held that a federal law that is analogous to the ADA for preemption purposes (the Federal Aviation Administration Authorization Act of 1994 (FAAA), 49 U.S.C. § 1450)[10] did not preempt California's Prevailing Wage Law (CPWL), CAL. LABOR CODE §§ 1770-1780, because it regulated employer-employee relationships and only indirectly affected industry prices and services. 152 F.3d at 1189. The CPWL "required contractors and subcontractors who are awarded public works contracts to pay their workers 'not less than the general prevailing rate . . . for work of a similar character in the locality in which the public work is performed.'" *Id.* at 1186 (alteration in original) (quoting CAL. LABOR CODE § 1771). Public works contractors sued the California agencies responsible for enforcing the CPWL, contending that the FAAA preempted the CPWL because the CPWL "related to" the contractors' prices and services. *Id.* at 1189. The contractors argued that the law "increase[d] its prices by 25%, cause[d] it to utilize independent owner-operators, and compel[ed] it to re-direct and re-route equipment to

---

[10] The preemption provision states, "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

37

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

compensate for lost revenue." *Id.* The Ninth Circuit rejected that argument, concluding that the CPWL was not a law that directly regulated prices or services—instead, it regulated employer-employee relationships, and its "effect [was] no more than indirect, remote, and tenuous." *Id.* Thus, the court held that the FAAA did not preempt the CPWL. *Id.*

We agree with the First and Ninth Circuits and hold that the ADA does not preempt Proposition 1 because Proposition 1 regulates employer-employee relationships and its affect on airline prices and services is only indirect and tenuous. As discussed above, Proposition 1 establishes minimum wage and other employee protections—it does not directly regulate airline prices and services. The fact that Proposition 1 may impose costs on airlines and therefore affect fares is inconsequential. As the First Circuit noted, holding that a state law is preempted in that circumstance "would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence." *DiFiore,* 646 F.3d at 89. Interpreting the "relate to" provision of the ADA so broadly would be "a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., NA,* 519 U.S. 316, 335, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997) (Scalia, J., concurring). We refuse to adopt such a broad reading of the ADA's preemption provision and hold that the ADA does not preempt Proposition 1.

38

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*IV. Dormant Commerce Clause*

Filo Foods's final contention is that Proposition 1 violates the dormant commerce clause. U.S. CONST. art. I, § 8, cl. 3. The trial court rejected this argument. So do we.

The United States Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority" to discriminate against or place burdens on interstate commerce. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007). The first question under the dormant commerce clause doctrine is whether the state law "discriminates on its face against interstate commerce." *Id.* "In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99, 114 S. Ct. 1345, 128 L. Ed. 2d 13 (1994)). "Discriminatory laws motivated by 'simple economic protectionism' are subject to a 'virtually *per se* rule of invalidity,' which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *Id.* at 338-39 (citation omitted) (quoting *City of Philadelphia*, 437 U.S. 617, 624, 98 S. Ct. 2531, 57 L. Ed. 2d 475 (1978)).

However, if a state law does not "discriminate[] on its face against interstate commerce," *id.* at 338, the law is subject to "the test set forth in *Pike v. Bruce Church,*

39

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Inc.*, 397 U.S. 137, 142[, 90 S. Ct. 844, 25 L. Ed. 2d 174] (1970), which is reserved for laws 'directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.'" *Id.* at 346 (quoting *City of Philadelphia*, 437 U.S. at 624). Under the *Pike* test, a nondiscriminatory state statute remains valid unless the burden it imposes on interstate commerce is "'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike*, 397 U.S. at 142).

Filo Foods contends that Proposition 1 discriminates on its face against interstate commerce. That is so, Filo Foods contends, because Proposition 1 "distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market by singling out those businesses that principally serve the Airport and air travelers." Filo Foods's Opening Br. at 52-53. This argument misunderstands the nature of facial discrimination. A facially discriminatory law textually identifies out-of-state persons or entities and grants them unfavorable treatment. *See, e.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 568 & n.2, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997). That is not what Proposition 1 does. Proposition 1 does not distinguish between persons and entities located in Washington State and those located outside Washington State. The law accordingly does not facially discriminate against interstate commerce.

Instead, Proposition 1 must be analyzed under the *Pike* test because it is a facially nondiscriminatory law that may have an incidental effect on interstate

40

commerce. But Filo Foods does not argue, much less demonstrate, that the undisputed facts establish as a matter of law that "'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *United Haulers Ass'n*, 550 U.S. at 346 (alteration in original) (quoting *Pike*, 397 U.S. at 142). Accordingly, under the *Pike* test, we hold that Filo Foods has not established that Proposition 1 violates the dormant commerce clause.

## CONCLUSION

We largely affirm the trial court, but we reverse on two issues. We hold that under state law, Proposition 1 can be enforced at the Seattle-Tacoma International Airport because there has been no showing that this law would interfere with airport operations. We also hold that federal labor law does not preempt Proposition 1's provision protecting workers from retaliation. Consequently, we uphold Proposition 1 in its entirety.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

WE CONCUR:

*Filo Foods, LLC, et al. v. City of SeaTac, et al.*

No. 89723-9

STEPHENS, J. (dissenting in part)—I disagree with the majority's conclusion that Proposition 1 may be applied at the Seattle-Tacoma International Airport consistent with the Revised Airports Act, RCW 14.08.330. In my view, the majority's result offends the statute's plain language, which provides that "[e]very airport" shall be under "the exclusive jurisdiction and control" of the "municipality . . . controlling and operating it." *Id.* Here, it is undisputed that the Port of Seattle controls and operates the Seattle-Tacoma International Airport. Its jurisdiction is therefore exclusive. Further, the statute provides "[n]o other municipality in which the airport . . . is located shall have any police jurisdiction of the [airport]." *Id.* It is undisputed that the city of SeaTac is the municipality in which the airport is located. The city of SeaTac thus has no police jurisdiction at the airport. A straightforward application of RCW 14.08.330 should end the matter.

Instead of applying the statute's clear rule, the majority holds that Proposition 1 applies at the Seattle-Tacoma International Airport because the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

plaintiffs did not make a "factual showing that Proposition 1 would interfere with airport operations." Majority at 19. This creates an unworkable rule requiring courts to adjudicate the jurisdictional boundary between governmental entities, determining in this case whether the city of SeaTac's ordinances "interfere" with the undefined concept of "airport operations." *Id.* The legislature decisively rejected such an uncertain case-by-case approach to airport regulation. I would hold that Proposition 1 may not be enforced at the Seattle-Tacoma International Airport. To this extent, I respectfully dissent.

## I. The Revised Airports Act, RCW 14.08.330

### A. RCW 14.08.330 Provides That Proposition 1 Cannot Be Applied at the Seattle-Tacoma International Airport

As we emphasize in every case of statutory interpretation, "[i]f the statute's meaning is plain, we give effect to that meaning as the expression of the legislature's intent." Majority at 10 (citing *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). Only if "the statutory language is susceptible to more than one reasonable interpretation, it is ambiguous, and we may 'resort to extrinsic aids, such as legislative history,' to resolve the ambiguity." *Id.* (internal quotation marks omitted) (quoting *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005)).

In my view, there is no ambiguity in RCW 14.08.330. The statute simply provides, in relevant part, that "[e]very airport . . . controlled and operated by any municipality . . . shall, subject to federal and state laws, rules, and regulations, be

-2-

under the exclusive jurisdiction and control of the municipality . . . controlling and operating it." RCW 14.08.330. Here, it is undisputed that the Port of Seattle is the municipality that controls and operates the Seattle-Tacoma International Airport. Therefore, the Seattle-Tacoma International Airport is under the exclusive jurisdiction and control of the Port of Seattle.[1]

RCW 14.08.330 also provides that "[*n*]*o other municipality in which the airport . . . is located* shall have any police jurisdiction of the [airport] or any authority to charge or exact any license fees or occupation taxes for the operations." (Emphasis added.) Here, it is undisputed that the "municipality in which the airport . . . is located" is the city of SeaTac. *Id.* Therefore, the city of SeaTac has no police jurisdiction over the Seattle-Tacoma Internal Airport and cannot charge or exact any license fees or occupation taxes for the airport operations.[2]

_____

[1] Of course, both federal law and state law apply at the Seattle-Tacoma International Airport, as RCW 14.08.330 recognizes. I will discuss below the majority's point about another state law, the Minimum Wage Act, RCW 49.46.120. Based on my resolution under RCW 14.08.330, there is no need to consider whether applicable federal law prohibits applying Proposition 1 at the airport.

[2] The majority contends that my reading renders superfluous RCW 14.08.330's provision concerning police jurisdiction, license fees, and occupation taxes. Not so. The city of SeaTac and the Port of Seattle agree that the term "'police jurisdiction'" in the statute "is not synonymous with the police power. Rather, 'police jurisdiction' refers to a municipality's authority to exercise extraterritorial jurisdiction." Br. of Appellants City of SeaTac and Kirstina Gregg, City of SeaTac Clerk at 10 & n.16; *accord* Br. of Resp't Port of Seattle at 11. The purpose of the statute's provision that SeaTac "shall [not] have any police jurisdiction" of the airport is to foreclose the city's otherwise colorable argument that, although it does not have traditional police powers at the airport under RCW 14.08.330's first sentence, it has extraterritorial "police jurisdiction" there. RCW 14.08.330. The fact that the legislature went out of its way to expressly reject this argument reinforces the scope of the exclusive jurisdiction articulated in RCW 14.08.330's first sentence.

The statute contemplates that an airport will be owned and operated by one municipality, though physically located in another municipality's territory. And the statute's delineation of those two municipalities' respective jurisdiction is clear. The "municipality . . . controlling and operating" the airport has "exclusive jurisdiction and control." *Id.* The "municipality in which the airport . . . is located" has "[no] police jurisdiction." *Id.* The statute thus evidences the legislative desire to avoid uncertainty between jurisdictional lines. Its plain language compels the result that the Port of Seattle is the only local jurisdiction whose laws apply at the Seattle-Tacoma International Airport. Our analysis of RCW 14.08.330 should end there.[3]

B. *The Majority's New Test for RCW 14.08.330 Belies the Statute's Text, Renders Other Provisions Meaningless, and Will Prove Unworkable*

The majority creatively seeks to avoid the statute's plain language by dividing the Seattle-Tacoma International Airport into two parts. The first part is a

---

Nor is the statute's provision that denies SeaTac authority to charge or exact any license fees or occupation taxes at the airport superfluous. As is common in legislation, RCW 14.08.330 includes a general provision followed by specific examples that are included out of an abundance of caution. The specific prohibition on license fees and occupation taxes clarifies the general language on exclusive jurisdiction; it is not superfluous. *E.g.*, HENRY CAMPBELL BLACK, HANDBOOK ON THE CONSTRUCTION AND INTERPRETATION OF THE LAWS 431 (2d ed. 1911) ("[A] proviso . . . may be introduced from excessive caution, and designed to prevent a possible misinterpretation of the statute . . . .").

[3] The majority relies on dicta from *King County v. Port of Seattle*, 37 Wn.2d 338, 348, 223 P.2d 834 (1950), stated in the context of our conclusion that RCW 14.08.330 does not violate the constitutional provision that "'[t]here shall be no territory stricken from any county.'" (Quoting WASH. CONST. art. XI, § 3.) Separate from determining the statute's constitutionality, when we *applied* RCW 14.08.330, we held RCW 14.08.330 *precludes* King County from enforcing taxi licensing fees at Seattle-Tacoma International Airport. *Id.* at 346-47. The case's holding provides no support to *authorize* a local regulation at the Seattle-Tacoma International Airport.

place—the geographic area in which the Port of Seattle owns title to the land and has the power to regulate. The second part is a set of activities—"airport operations and the subject of aeronautics." Majority at 14 (emphasis omitted). As the majority sees things, it is only as to the second part that the Port of Seattle has exclusive jurisdiction and control. *Id.* at 14-15. After announcing this new interpretation, the majority concludes, "Proposition 1 has nothing to do with airport operations or the subject of aeronautics," so the city of SeaTac has not invaded the Port of Seattle's exclusive jurisdiction and control. *Id.* at 16. I disagree with the majority's interpretation and application.

The majority's distinction, between the airport as a geographic area and as a set of functional activities ("airport operations or the subject of aeronautics," *id.*), is nowhere to be found in the statute. The subject of the statute is simply "[e]very airport." RCW 14.08.330. The statute does not slice and dice an "airport" to reveal some sort of "core airport function" judicial test. Instead the statute concerns, as its language says it does, the airport.

The statute's structure confirms this. The statute follows a general rule/exception structure. Its general rule is that the municipality controlling and operating the airport (the Port of Seattle) shall have exclusive jurisdiction and control over the airport, and that no other municipality in which the airport is located (the city of SeaTac) shall have any police jurisdiction of the airport. RCW 14.08.330. The statute then has one exception to that rule. The exception provides "However, . . . a municipality in which an airport . . . is located" (the city of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

SeaTac) "may be responsible for the administration and enforcement of the uniform fire code . . . on that portion of any airport . . . located with its jurisdictional boundaries," so long as it does this "by agreement with the municipality operating and controlling the airport," (the Port of Seattle). *Id.* Thus, a fire code is the single circumstance in which the city of SeaTac can enforce its laws within the airport.

This exception disproves the majority's conclusion that "airport" in RCW 14.08.330 means only "airport operations or the subject of aeronautics," majority at 16. If the legislature intended the operating municipality's exclusive jurisdiction to be over only that narrow functional concept, why would the legislature specify an exception from the operating municipality's exclusive jurisdiction to allow the municipality in which the airport sits to enforce *a fire code* at the airport? Under the majority's view of the statute, the fire-code exception is simply unneeded because the city of SeaTac can already enforce a fire code at Seattle-Tacoma International Airport because that does not concern "airport operations or the subjection of aeronautics," *id.*

The fire-code exception creates a second puzzle under the majority's test. The exception provides that the city in which the airport is located (the city of SeaTac) may enforce a fire code within the airport only if the city does so "by agreement with the municipality operating and controlling the airport" (the Port of Seattle). RCW 14.08.330. As the majority notes, this exception was crafted by legislative amendment in response to concerns raised by the Seattle city attorney.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Under the majority's holding, the fire code exception seems misplaced. If the city of SeaTac can *unilaterally* impose other measures at the airport, such as Proposition 1's sweeping wage and employee right protections, what is the point of requiring the Port of Seattle's consent to enforce a minimally intrusive fire code?. Unless the majority is willing to say that enforcing a fire code "interfere[s]" with "airport operations or the subject of aeronautics," majority at 16, the majority leaves unanswered what role the fire code exception plays under its interpretation of the statute.

The majority's flawed interpretation of RCW 14.08.330 foreshadows the statute's troubled future. Under the majority opinion, whether a business operating on airport property is bound by a city's local law will now turn on case-by-case adjudication in court about whether the city's particular ordinance "interfere[s]" with "airport operations or the subject of aeronautics," *id.* at 16, however that concept may be construed. Even the SeaTac Committee for Good Jobs concedes that some minimum wage ordinances will affect "airport operations" under certain circumstances—though it maintains that Proposition 1 does not do so. *See* Wash. Supreme Court Oral Argument, *Filo Foods LLC v. City of SeaTac*, No. 89723-9 (June 26, 2014), at 17 min., 26 sec. through 19 min. 35 sec., *audio recording by* TVW, Washington State's Public Affairs Network. To see the confusion the majority's holding will create, consider the majority's application of its new test to this case. The majority simply asserts and concludes, "Proposition 1 has nothing to do with airport operations or the subject of aeronautics." Majority at 16. Yet,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Proposition 1's text specifically regulates the performance of quintessential airport activities that the Port of Seattle contracts for, regulates, and licenses, including "aircraft interior cleaning; aircraft carpet cleaning; aircraft washing and cleaning; aviation ground support equipment washing and cleaning; aircraft water or lavatory services; [and] aircraft fueling." SEATAC MUNICIPAL CODE 7.45.010(M)(1)(a); *see also* Br. of Resp't Port of Seattle at 27-32 (describing the Port of Seattle's regulation of these and other activities that Proposition 1 attempts to regulate). The majority's summary conclusion that "Proposition 1 has nothing to do with airport operations or the subject of aeronautics," majority at 16, makes the majority's new test all the more troubling.

The legislature did not intend to foster a cottage industry of litigation over airport operations, where the courts arrive at case-by-case conclusory determinations under an imprecise test. It chose to draw a clear line. It enacted a statute that gives exclusive jurisdiction and control to the operating municipality. RCW 14.08.330. And it specifically said that "[n]o other municipality in which the airport . . . is located shall have any police jurisdiction of the [airport]." *Id.* The legislature understood that because airports are unique, complex operations, they should be governed by one and only one local government—the one that specializes in controlling and operating them. This desire to have legal clarity at airports is especially understandable considering that airports can straddle multiple municipal, county, or state lines. *See* RCW 14.08.200 (multiple municipalities

-8-

may jointly operate an airport), .030 (municipalities may establish airports outside this state).

## II. The Minimum Wage Act, RCW 49.46.120

The majority offers an independent reason why the city of SeaTac can apply Proposition 1 at the Seattle-Tacoma International Airport. It believes the Minimum Wage Act, RCW 49.46.120, authorizes the ordinance to apply there. *See* majority at 17-19. No doubt, state law could authorize a city in which an airport is located to apply its ordinances at the airport. The Revised Airports Act makes this clear: the municipality controlling and operating an airport has exclusive jurisdiction and control of the airport, "*subject to* federal and *state laws, rules, and regulations*." RCW 14.08.330 (emphasis added).

The majority relies on the Minimum Wage Act's provision that "any applicable federal, state, or local law or ordinance" that is more favorable to employees than state law remains effective. RCW 49.46.120. The majority reasons:

> [S]tate law sets the minimum wage in any given location at the most favorable level to the employee whether by federal, state, or local law. . . . The Port of Seattle's regulatory authority over the airport is subordinate to all state laws, including state minimum wage law, that require it to comply with local minimum wage laws.
> . . . .
> Under Filo Foods's reading, the two statutes would be inconsistent with one another. RCW 46.46.120 mandates that the laws in any given location most favorable to the employee shall be in full force and effect. That provision would be meaningless if the Port of Seattle could trump such laws in airports it controls. RCW 49.46.120 does not carve out an exception for airports, and RCW 14.08.330 does not contain any language indicating that the Port of Seattle's jurisdiction and control over the airport includes the power to trump local minimum wage laws. As state above,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that provision precludes the city of SeaTac only from interfering with the operations of an airport. The ordinance does not do so.

Majority at 18-19. This line of reasoning takes down an argument no one is making. No one believes the Port of Seattle can "trump" the most employee-friendly applicable law.

The Minimum Wage Act provides that the most employee-friendly "*applicable . . .* local law" governs. RCW 49.46.120 (emphasis added). It does not, as the majority believes, "set[] the minimum wage *in any given location* at the most favorable level to the employee whether by federal, state, or local law." Majority at 18 (emphasis added). Nor is the majority justified in its assumption that the relevant "given location" includes the Seattle-Tacoma International Airport. Instead, the Minimum Wage Act expressly leaves the question of an ordinance's *applicability* for other cases. And this case asks whether Proposition 1 *applies* at the Seattle-Tacoma International Airport in light of RCW 14.08.330's apparent shield against its application there. To say that the Minimum Wage Act *determines* that Proposition 1 is an "applicable . . . local law," RCW 49.46.120, at the Seattle-Tacoma International Airport is to assume the very conclusion we are debating. For that reason, the Minimum Wage Act does not aid our analysis.

### III. Conclusion

I would affirm the superior court's judgment and hold that the plain language of the Revised Airports Act, RCW 14.08.330, compels the result that the municipality controlling and operating an airport has exclusive jurisdiction and control over the airport, and the municipality in which the airport is located has no

-10-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

police jurisdiction of the airport. The city of SeaTac's Proposition 1 cannot be enforced at the Seattle-Tacoma International Airport.

I do not share the majority's concern that absent the application of Proposition 1 at the Seattle-Tacoma International Airport, those who work at the airport could be without legal recourse for obtaining employee protections. This concern appears to rest on the view that the Port of Seattle, as a special purpose district, has "functional differences" from the city of SeaTac. Majority at 10. But, we know the Port of Seattle recently enacted various protections for employees who work at the Seattle-Tacoma International Airport, including that total minimum compensation per hour must presently be $13.72 and must be $15.50 within two years.[4] And apart from the Port of Seattle's employment regulations, employees at the Seattle-Tacoma International Airport may seek the protection of state law and federal law, just as is the case for the roughly 2.5 million residents of unincorporated areas in this state without city governments.[5] This is the structure

_____

[4] *See* PORT OF SEATTLE, RESOLUTION 3694 (as amended July 22, 2014), https://www.portseattle.org/About/Commission/Commission-Resolutions/Resolutions/Resolution_No_3694_as_amended.pdf). Litigants challenged whether the Port of Seattle has the statutory power to adopt these employee protections. But the United States District Court for the Western District of Washington denied those plaintiffs' motion for a preliminary injunction to enjoin the Port of Seattle's regulations. The court found the plaintiffs did not show a likelihood of success on the merits and held the Port of Seattle has authority to adopt these employee protections. *See Air Transport Ass'n of Am., Inc. v. Port of Seattle*, No. C14-1733-JCC (W.D. Wash. Dec. 19, 2014) (court order) (appeal pending). Notwithstanding the majority's dicta on the subject, the Port of Seattle's authority to adopt employment regulations is not at issue in this case.

[5] *See* OFFICE OF FIN. MGMT. FORECASTING & RESEARCH DIV., STATE OF WASHINGTON: 2014 POPULATION TRENDS 15 (2014), http://www.ofm.wa.gov/Pop/april1/poptrends.pdf; *see also id.* at 4 ("[T]he five largest unincorporated county areas (Pierce, Snohomish, King, Clark, and Kitsap) have almost [the same] population as the five

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of government that the legislature choose to institute for airports. I would leave it undisturbed. Accordingly, I respectfully dissent on this issue.

---

largest cities in the state (Seattle, Spokane, Tacoma, Vancouver, and Bellevue), 1.34 versus 1.36 million respectively.").

Stephens, J.

Wiggins, J.
Fairhurst, J.
Madsen, C.J.