# United States Court of Appeals
## For the First Circuit

Nos. 10-1108, 10-1167, 10-1264

DON DiFIORE; LEON BAILEY; RITSON DESROSIERS;
MARCELINO COLETA; TONY PASUY; LAWRENCE ALLSOP;
CLARENCE JEFFREYS; FLOYD WOODS; ANDREA CONNOLLY,
and all others similarly situated,

Plaintiffs, Appellees/Cross-Appellants,

v.

AMERICAN AIRLINES, INC.,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Lipez and Howard,

Circuit Judges.

Michael V. Powell with whom Locke Lord Bissell & Liddell LLP, Amy Cashore Mariani, Michael A. Fitzhugh, David J. Volkin and Fitzhugh & Mariani LLP were on brief for defendant, appellant/cross-appellee.
Robert S. Span and Steinbrecher & Span LLP on brief for Air Transport Association of America, Inc., Amicus Curiae.
Philip J. Gordon, President, Massachusetts Employment Lawyers Association c/o Gordon Law Group, LLP, Audrey R. Richardson, Greater Boston Legal Services, and Catherine K. Ruckelshaus, Nat'l Employment Law Project, on brief for Massachusetts Employment Lawyers Association (MELA), Greater Boston Legal Services (GBLS), and the National Employment Law Project (NELP), Amici Curiae.

Shannon Liss-Riordan with whom Hillary Schwab and Lichten & Liss-Riordan, P.C. were on brief for plaintiff, appellees/cross-appellants.

Scott L. Nelson and Allison M. Zieve, Public Citizen Litigation Group, on brief for Public Citizen, Inc., Amicus Curiae.

---

May 20, 2011

---

**BOUDIN**, <u>Circuit Judge</u>.   In September 2005, American Airlines, Inc. ("American") began charging passengers a fee of $2 for each bag checked with porters who provide curbside service (called "skycaps") at Boston's Logan Airport.   Arguing that passengers mistook the fee for a mandatory gratuity for the skycaps and stopped tipping, several porters brought suit against American; the present appeal is a product of that litigation.   The facts and proceedings are as follows.

Some passengers at Logan carry their own luggage into the airport and some have it brought inside to the counter by skycaps, but a great many check their luggage onto flights at curbside; ordinarily, the skycap will take the luggage from the curb, write up the baggage tags, and place the luggage on a conveyer belt destined for the airline cargo facilities.  Prior to 2005, American made skycap services available to its customers free of charge--beyond the plane fare--with the airline bearing the cost of skycap labor and other facilities involved in curbside check-in (conveyer belts, rent for space).

American once itself employed skycaps to provide these services to passengers but now, at least in Boston, relies primarily on contractors--most recently, a company called G2 Secure Staff, LLC ("G2").  Although all the American and G2 skycaps earned an hourly wage, their main source of income was tips.   The

customary gratuity at Logan Airport was about $1 per bag, and nearly all passengers tipped.

In early 2005, one of American's competitors began charging a curbside check-in fee in Seattle. American tested the idea there before expanding the practice to other cities across the country. Separate charges for services that had once been bundled together--for example, for in-flight meals or extra bags--were becoming common in airline operations during this period. Due to deregulation, airline fares had fallen on many major routes, airlines were suffering low profits or losses, and separate charges were one of the responses.

Like its competitors, American set the price for curbside check-in at $2 per bag, with an initial goal of merely offsetting the expense of providing skycap service. Revenues from the fee proved more than enough to recoup those costs, and American netted a substantial profit from the charge. In cities where American relied on contractors to provide skycap services, the airline and the contractor shared the proceeds from the new charge. At Logan, sixty percent went to the airline and forty percent to G2.

As for the skycaps, American knew that the new fee would lessen tip income from passengers at least temporarily; in fact, some hourly salaries for the G2 skycaps at Logan airport were raised to comply with minimum wage laws in light of reduced tips. The skycaps were required to collect the $2 fee in cash to be

turned over to the airline at the end of the business day; they were not supposed to solicit tips, although some apparently did; but they were free, if the customer inquired, to say that the fee was not a gratuity.

When it instituted the fee at Logan in September 2005, American notified its customers of the new charge on its website as well as on three large, poster-size signs adjacent to the bag-check podiums outside the airport terminal. A typical sign, in its original format, read as follows:

Curbside

Check-In

U.S. Domestic Flights

$2 Per Bag

American Airlines

Within a week or two, skycaps had added notations to the official signs saying "gratuity not included" or words to this effect, and American then revised its standard posters to include this caveat--placed in considerably smaller lettering immediately below the fee itself. By October 14, 2005, American had ordered several hundred signs with this revised language for use across the country; the website, which referred only to the $2 per bag charge, was not altered. In Boston, four of the modified signs were posted at the skycap podiums and along the curbside.

The skycaps' tip income fell significantly once the new charge began. Some passengers likely thought that $2 per bag was enough to pay and chose not to tip, but others interpreted the $2 fee as a mandatory tip to the skycap rather than a charge paid to the airline. Confusion persisted despite modification of the signs: the curbside can be hectic at busy times; there were other unrelated signs; and some luggage was collected far from the signage, down the line of parked cars and taxis.

In December 2006, two skycaps at Logan, Don DiFiore and Leon Bailey, brought a putative class action against G2 and American in Massachusetts Superior Court, which the defendants removed to federal district court on the basis of diversity jurisdiction. The claims against G2 were dismissed in light of an arbitration agreement, and class certification was denied. Eight more skycap plaintiffs joined the suit against American,[1] and the complaint was twice amended.

By the time of the third amended complaint--now the operative pleading--the claims against American were these: that American's curbside check-in fee violated a Massachusetts statute governing tips, Mass. Gen. Laws ch. 149, § 152A (2008); that the airline's conduct created liability under state common law as

[1]Of the ten, one skycap was directly employed by American at Logan, seven skycaps were employed by G2 at Logan, one skycap had formerly been employed by G2 at Logan, and one skycap was employed by American in St. Louis, Missouri.

tortious interference with advantageous relations, unlawful conversion, and unjust enrichment; and that the skycaps were entitled to restitution under principles of quantum meruit.

The tips law is the centerpiece of the appeal and its pertinent language provides that "[n]o employer or other person shall demand . . . or accept from any . . . service employee . . . any payment or deduction from a tip or service charge given to such . . . service employee . . . by a patron." Mass. Gen. Laws ch. 149, § 152A(b). The skycaps qualified as "service employees" for purposes of the statute. Id. § 152A(a). The term "service charge" is defined as

> a fee charged by an employer to a patron in lieu of a tip to any . . . service employee . . . including any fee designated as a service charge, tip, gratuity, or a fee that a patron or other consumer would reasonably expect to be given to a . . . service employee . . . in lieu of, or in addition to, a tip.

Id. The gravamen of the tips law claim is that the $2 fee is a "service charge" under state law (and must therefore go to the skycaps) because customers "reasonably expect[ed]" it to be given to the skycaps.

American moved to dismiss the complaint, or alternatively for summary judgment, principally on the ground that the claims were barred by the express preemption clause of the Airline Deregulation Act: no state may "enact or enforce a law, regulation, or other provision having the force and effect of law related to a

price, route, or service of an air carrier."    49 U.S.C. §
41713(b)(1) (2006).  Judge Young denied the motion, <u>DiFiore</u> v. <u>Am.
Airlines, Inc.</u>, 483 F. Supp. 2d 121, 128 (D. Mass. 2007), but later
granted summary judgment to American on the <u>quantum meruit</u>,
conversion, and unjust enrichment counts--theories not pursued on
appeal.

The claim for recovery under the tips law, Mass. Gen.
Laws ch. 149, § 152A(f), and the tortious-interference claim were
both tried to a jury in March and April 2008.  The jury awarded
each Logan skycap plaintiff $2 per bag checked at curbside by that
skycap from September 2005 to the start of trial, "plus fees
collected in March and April 2008" during the trial.  The St. Louis
skycap--not covered by the Massachusetts tips law and bringing only
a tortious-interference claim under Missouri law--was awarded
nothing and has not appealed.

For those Logan skycaps who claimed both tortious
interference and a violation of the tips statute, the jury awarded
identical damages on both theories.[2]  The district court construed
state law as permitting the jury to award treble damages, <u>see</u> Mass.

---

[2]The district court permitted only seven of the nine Logan
skycaps to pursue both theories at trial.  During discovery, two
skycaps asserted their privilege against self-incrimination to
withhold their tax records; those two skycaps were precluded from
presenting evidence of damages that would have been required to
make out a claim for tortious interference.  The district court
also made clear to the jury that no duplicative recovery would be
permitted for skycaps who prevailed on both theories.

Gen. Laws Ann. ch. 149, § 150 (West 2004) (amended 2008); Wiedmann v. Bradford Grp., Inc., 831 N.E.2d 304, 313 (Mass. 2005), but the jury declined to award anything on this account.

Thereafter the district court temporarily set aside the jury award but reinstated it after the state's highest court answered a certified question--not germane to the disputed issues on this appeal--involving the interpretation of the tips statute. DiFiore v. Am. Airlines, Inc., 910 N.E.2d 889, 891 (Mass. 2009). Further post-trial motions led to another opinion rejecting the preemption claim, DiFiore v. Am. Airlines, Inc., 688 F. Supp. 2d 15, 23-24 (D. Mass. 2009), and determining damages for the period of March and April 2008, id. at 25-26.

A final amended judgment gave the nine prevailing skycaps $333,464 plus prejudgment interest; the court also awarded attorneys' fees and costs. American now appeals on multiple grounds; the successful skycap plaintiffs cross-appeal, arguing that the tips statute award should have been trebled. The central issue, federal preemption, is a question of statutory construction that we review de novo. United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 330 (1st Cir. 2003). That it is a difficult one is confirmed by decisions conflicting with that of Judge Young by two other judges in the same district court.[3]

---

[3] See Brown v. United Air Lines, Inc., 656 F. Supp. 2d 244, 249-51 (D. Mass. 2009) (Gertner, J.) (holding tips law preempted); Travers v. JetBlue Airways Corp., No. 08-cv-10730, 2009 WL 2242391,

The Airline Deregulation Act was enacted in 1978 as part of a wave of deregulatory measures adopted in the 1970s and 1980s. Prior airline regulation based on a public utility model had produced good service but at relatively high prices--high, at least, compared to much lower fares that emerged under competition. To assure that the new regime was not trammeled by state re-regulation, the 1978 statute preempted state laws "relating to rates, routes, or services." Pub. L. No. 95-504, § 4(a), 92 Stat. 1705, 1707-08 (1978) (codified at 49 U.S.C. app. § 1305(a)(1) (1982)); see also New Eng. Legal Found. v. Mass. Port Auth., 883 F.2d 157, 173 (1st Cir. 1989).

When Congress later recodified Title 49, the 1978 preemption language was relocated in the same Title (to section 41713) and slightly rephrased to cover all state laws "related to a price, route, or service," Pub. L. No. 103-272, § 1(e), 108 Stat. 745, 1143 (1994), but the changes were stylistic and "not intend[ed] to impair the applicability of prior judicial case law interpreting these provisions," H.R. Rep. No. 103-677, at 83 (1994) (Conf. Rep.), reprinted in 1994 U.S.C.C.A.N. 1715, 1755. That Conference Report concerned a new statute carrying over the same

---

at *2-3 (D. Mass. July 23, 2009) (O'Toole, J.) (same); see also Thompson v. U.S. Airways, Inc., 717 F. Supp. 2d 468, 477-79 (E.D. Pa. 2010) (finding no preemption of Pennsylvania tips statute and common law claims); Jones v. Am. Airlines, Inc., No. 5:08-cv-236, slip op. at 11-13 (E.D.N.C. Oct. 15, 2008) (same, for North Carolina common law claims).

preemption phrasing to apply it to motor carriers and certain air carriers functioning as motor carriers.[4]

Case law is especially important in interpreting section 41713 because Congress' language in the preemption section--always the first resort in construing a federal statute--is broad but vague. A trio of Supreme Court cases have addressed and applied the statutory provision in question: Morales v. Transworld Airlines, Inc., 504 U.S. 374 (1992), American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), and Rowe v. New Hampshire Motor Transport Ass'n, 552 U.S. 364 (2008). Although helpful in marking out results, none provides an easily applied test.

The difficulty is that the key connector in the statute-- "related to"--is highly elastic, Morales, 504 U.S. at 383-84, and so of limited help, given that countless state laws have some relation to the operations of airlines and thus some potential effect on the prices charged or services provided. Equally general is the gloss supplied by the cases of a "'significant impact' related to Congress' deregulatory and pre-emption related objectives," rather than one merely "tenuous, remote, or

---

[4]Federal Aviation Administration Authorization Act of 1994, Pub. L. No. 103-305, § 601(b)-(c), 108 Stat. 1569, 1605-06 (now codified at 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)). Courts have construed the two statutes in pari materia and have cited precedents concerning either act interchangeably, see United Parcel Serv., 318 F.3d at 334-35 & n.17, as we do in this decision.

-11-

peripheral." Rowe, 552 U.S. at 371 (quoting Morales, 504 U.S. at 390).

The statutory preemption language might have been read to target only state enactments focusing solely on airlines, but that reading has been twice rejected by the Supreme Court. Wolens, 513 U.S. at 227-28; Morales, 504 U.S. at 386. Similarly, preemption might have been confined to state laws that themselves aimed at economic regulation as opposed to other state interests,[5] but that course too has been foreclosed. Rowe, 552 U.S. at 373-76. So we are left to triangulate from the results in the leading Supreme Court decisions--Morales, Wolens, and Rowe--with some limited assistance from circuit court decisions.

All three of the major Supreme Court cases endorsed preemption and read the preemption language broadly, e.g., Rowe, 552 U.S. at 370-71; Morales, 504 U.S. at 383-84, and none adopted plaintiffs' position in this case that we should presume strongly against preempting in areas historically occupied by state law, see e.g., Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994). The state laws preempted in Morales, Wolens, and Rowe involved

---

[5]Thus, the House Committee report on the 1978 statute said that the preemption clause was drafted to eliminate "uncertainties and conflicts" over federal and state rate-regulating authority, including situations in which carriers had been forced to charge different rates to passengers traveling between the same two cities, depending on whether those passengers' entire itineraries involved intrastate or interstate travel. H.R. Rep. No. 95-1211, at 15-16 (1978), reprinted in 1978 U.S.C.C.A.N. 3737, 3751-52.

(respectively) deceptive advertising, alleged consumer abuse, and protection of health--areas historically regulated by states. However traditional the area, a state law may simultaneously interfere with an express federal policy--here, one limiting regulation of airlines.

The state regimes at issue in <u>Morales</u> and <u>Wolens</u>, although based on generally applicable statutes, involved detailed guidelines crafted by state authorities directed against airlines; the statute in <u>Rowe</u> directly targeted carriers. But it is hard to imagine that Congress would have been happier if, absent detailed guidelines or a law targeting carriers, the states in <u>Morales</u>, <u>Wolens</u>, and <u>Rowe</u> simply let the jury condemn the same carrier conduct by applying broader statutory terms (<u>e.g.</u>, "unfair" competition or "deceptive" practices, <u>Wolens</u>, 513 U.S. at 227).

However, there also exists a set of circuit cases declining to preempt state anti-discrimination[6] and retaliation laws,[7] as well as one case declining to preempt state prevailing

---

[6]<u>E.g.</u>, <u>Wellons</u> v. <u>Nw. Airlines, Inc.</u>, 165 F.3d 493, 496 (6th Cir. 1999) (race discrimination); <u>Parise</u> v. <u>Delta Airlines, Inc.</u>, 141 F.3d 1463, 1466 (11th Cir. 1998) (age discrimination); <u>Abdu-Brisson</u> v. <u>Delta Air Lines, Inc.</u>, 128 F.3d 77, 83-84 (2d Cir. 1997) (same); <u>Aloha Islandair Inc.</u> v. <u>Tseu</u>, 128 F.3d 1301, 1303 (9th Cir. 1997) (disability discrimination).

[7]<u>E.g.</u>, <u>Gary</u> v. <u>Air Grp., Inc.</u>, 397 F.3d 183, 189 (3d Cir. 2005) (retaliation for reporting safety violation); <u>Branche</u> v. <u>Airtran Airways, Inc.</u>, 342 F.3d 1248, 1259-60 (11th Cir. 2003) (same), <u>cert. denied</u>, 540 U.S. 1182 (2004); <u>Anderson</u> v. <u>Am. Airlines, Inc.</u>, 2 F.3d 590, 597-98 (5th Cir. 1993) (retaliation for filing workers' compensation claim).

-13-

wage laws, Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1189 (9th Cir. 1998), cert. denied, 526 U.S. 1060 (1999). Negligence claims have been upheld against airlines for injuries occurring during airline operations themselves,[8] and the Ninth Circuit has even held possible a claim that might entail a rearrangement of cabin seating to reduce the risk of deep vein thrombosis, Montalvo v. Spirit Airlines, 508 F.3d 464, 474-75 (9th Cir. 2007). But see Witty v. Delta Air Lines, Inc., 366 F.3d 380, 383 (5th Cir. 2004).

These circuit cases confirm our view that the Supreme Court would be unlikely--with some possible qualifications--to free airlines from most conventional common law claims for tort, from prevailing wage laws, and ordinary taxes applicable to other businesses. Yet such measures must impact airline operations--and so, indirectly, may affect fares and services. And the tips law, like prevailing wage laws, is aimed at protecting employee compensation.

The dividing line turns on the statutory language "related to a price, route, or service." Importantly, the tips law does more than simply regulate the employment relationship between

---

[8]E.g., Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261-62, 1266 (9th Cir. 1998) (en banc) (various personal injuries incurred onboard and while boarding); Hodges v. Delta Airlines, Inc., 44 F.3d 334, 338 (5th Cir. 1995) (en banc) (injury by cargo falling from overhead bin); cf. Wolens, 513 U.S. at 231 n.7 (noting airline's concession at oral argument that torts arising from negligent operations would generally escape preemption).

the skycaps and the airline; unlike the cited circuit cases, the tips law has a <u>direct connection</u> to air carrier prices and services and can fairly be said to regulate both. As to the latter, American's conduct in arranging for transportation of bags at curbside into the airline terminal en route to the loading facilities is itself a part of the "service" referred to in the federal statute, and the airline's "price" includes charges for such ancillary services as well as the flight itself.

This view depends on reading "price" to include more than the ticket price and "service" to include steps that occur before and after the airplane is actually taxiing or in flight. On these issues the lower court decisions have not been uniform.[9] But this dispute has been superceded by controlling Supreme court case law--namely, by <u>Rowe</u>'s expansive treatment of the term "service." <u>Air Transp. Ass'n</u>, 520 F.3d at 223 (citing <u>Rowe</u>, 552 U.S. at 376). The weight of circuit court authority now favors the broader definition. <u>See</u> <u>id.</u> (collecting cases).

---

[9]<u>Compare</u> <u>Air Transp. Ass'n of Am.</u> v. <u>Cuomo</u>, 520 F.3d 218, 222 (2d Cir. 2008) (per curiam) (defining "service" for purposes of the preemption clause to "encompass[] matters such as boarding procedures, baggage handling, and food and drink--matters incidental to and distinct from the actual transportation of passengers"), <u>with</u> <u>Charas</u>, 160 F.3d at 1261 (defining "service" as "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail" but not "an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities").

-15-

Thus, the tips law as applied here directly regulates how an airline service is performed and how its price is displayed to customers--not merely how the airline behaves as an employer or proprietor. To avoid having state law deem the curbside check-in fee a "service charge" would require changes in the way the service is provided or advertised. Much of the trial below turned on the size of type stating the charge, the visibility of the posters, what customers could and would be told by the skycaps, and whether the airline should provide credit card machines that would more clearly distinguish the charge as a payment to the airline.

Thus, in application, the Massachusetts tips statute, although mediated by a jury, has the same potential impact on American's practices as a guideline condemning the same conduct explicitly. If anything, the problem of diverse regimes is even greater than merely allowing fifty states to impose restrictions of their own. In Massachusetts, individual juries would effectively design their own detailed, ad hoc compliance schemes based on the size, location and wording of the signs posted by the airline.[10]

The Supreme Court has also said that federal preemption does not reach state laws that have only "tenuous, remote, or

---

[10]It is worth noting that, as the Supreme Court has repeatedly emphasized, the federal Department of Transportation "retains authority to investigate unfair and deceptive practices and unfair methods of competition by airlines, and may order an airline to cease and desist from such practices or methods of competition." Wolens, 513 U.S. at 223 n.4; see also Morales, 504 U.S. at 390-91.

peripheral" impact.  Rowe, 552 U.S. at 371 (quoting Morales, 504 U.S. at 390).  The plaintiffs claim that the effect of the Massachusetts tips statute on prices and services is tenuous in this case, because the airline could comply with the state law without incurring great expense or substantially altering the gist of curbside check-in service.  Their proposed remedies include:

- Posting more signs in more prominent places
- Using larger font on the signs
- Modifying the American website to mention tips
- Permitting credit-card payments
- Installing a cash register at the curbside
- Re-bundling the cost of curbside check-in into ticket prices

This, to borrow an apt airplane image, is walking into a rotating propeller: the advertising and service arrangements are just what Congress did not want states regulating, whether at high cost or at low.  When the Supreme Court invoked the rubric ("tenuous, remote, or peripheral"), it used as examples limitations on gambling, prostitution, or smoking in public places--state regulation comparatively remote to the transportation function. See Morales, 504 U.S. at 390; Rowe, 552 U.S. at 371, 375.

Worse still, even if American took all of the steps listed (save the last), it could hardly be sure that it would be safe in imposing the $2 fee.  A jury might still conclude that some passengers would believe the $2, approximating what passengers might expect to tip, was destined for the skycaps themselves.  As for the last suggestion, that step would raise American's ticket

-17-

fare and, even if sustainable, would change the price for customers not using curbside check-in.  In other words, the tips statute as applied in this case could easily affect price and not just the provision of the service.

We do not endorse American's view that state regulation is preempted wherever it imposes costs on airlines and therefore affects fares because costs "must be made up elsewhere, i.e., other prices raised or charges imposed."  This would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence.  Our view that the tips statute is preempted, in its application to the present circumstances, rests instead on the reasoning and results in the three Supreme Court cases.

It is argued to us that American's conduct is no different than if the airline put out a jar labeled "tips" at the skycap counter and then appropriated the money dropped inside. American, however, did not tell customers that they were paying $2 per bag as a tip to skycaps; it said on posters identifying American Airlines as the patron that this was a charge for curbside baggage service, adding (when prompted) that a "gratuity" was not included.  Whether or not some passengers ignored the sign, property theft was not involved.

Nor is the outcome altered by the jury's alternative basis for the verdict--interference with advantageous relations.

-18-

To stand alone, the interference tort would require evidence that American's motives or means were improper because unrelated to any legitimate corporate interest. Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007); Brewster Wallcovering Co. v. Blue Mtn. Wallcoverings, Inc., 864 N.E.2d 518, 531-32, 541 (Mass. App. Ct. 2007). Here, the jury instructions made plain that the improper motive or means element--required to make out the tort claim--could properly rest on the violation of the tips statute.

That the jury award on both claims did rest critically on the tips statute is evident from the fact that the jury rejected the tort claim of the sole plaintiff from Missouri, who was not covered by the Massachusetts tips law and who could rest only on the common law tort of interference with advantageous relations. Although American made this point on appeal, the skycaps' brief did not point to any material difference in the Massachusetts and Missouri tort claims. See also DiFiore, 688 F. Supp. 2d at 19. On this record, then, the jury concluded that the plaintiffs did not prove an independent common law interference claim.

The Massachusetts legislature, in amending the tips law to cover employees like skycaps, could have made a reasonable choice to favor local workers even at some cost and multiplication of rules for national enterprises like American, operating in many different states. But this kind of state-determined trade-off may be just what concerned Congress when it framed the preemption

-19-

provision.  In all events, <u>Morales</u>, <u>Wolens</u>, and <u>Rowe</u> appear to us to dictate the outcome here.

The judgment of the district court granting recovery and awarding attorneys' fees is <u>reversed</u> and the case is <u>remanded</u> for entry of judgment in favor of American.  Each side shall bear its own costs on this appeal.

<u>It is so ordered</u>.