Moses, Richard T., J.
The present action is before the court in connection with the First Amended Class Action Complaint filed on October 22, 2013, by the plaintiffs, Timothy P. Chambers (“Chambers”) and Leroy Johnson (“Johnson”), collectively referred to as the “plaintiffs,” against the defendants, RDI Logistics, Inc. (“RDI”) and Richard J. Deslongchamps, Jr. (“Deslongchamps”). In its amended complaint, plaintiffs claim to have been misclassified by RDI as independent contractors, rather than employees, in violation of G.L.c. 149, §148B. They have filed this action pursuant to G.L.c. 149, §150, claiming that they have been deprived of wages to which they are legally entitled. Also, plaintiffs assert a claim for unlawful retaliation in violation of G.L.c. 149, §148A, and a claim of unjust enrichment purportedly based upon the misclassification of the plaintiffs.
The defendants deny any misclassification of the plaintiffs, and have filed a counterclaim against Johnson alleging that any claim which he has asserted is barred by a release executed by him.
The plaintiffs have moved for partial summary judgment under G.L.c. 149, §148B, seeking a ruling that they are employees of the defendants, RDI and Deslongchamps, for the purposes of the Massachusetts Wage Act. Defendants have filed an opposition to the aforesaid motion seeking denial of the same, and entry of summary judgment in defendants’ favor, claiming that the application of the Massachusetts Wage Act is preempted by the Federal Aviation Administration Authorization Act of 1994 (The “FAAAA”), 49 U.S.C. §14501. Further, RDI asserts that the provisions of the Massachusetts Wage Act do not apply in the circumstances in the case at bar in that the plaintiffs operated through legitimate business entities, and further, that even were the Massachusetts Wage Act to apply, the plaintiffs have not established the absence of genuine issues of material fact as to whether they were misclassified. Lastly, it is asserted that the plaintiffs have faded to demonstrate any misclassification resulted in a violation of any of the statutes enumerated in section 148B, and have failed to demonstrate that any damage was suffered on account of any violation.
The parties appeared before the court on June 2, 2015, for argument, and the matter was taken under advisement.
Thereafter, defendants filed with the court their “Notice of Supplemental Authorities” providing additional authorities on their claim of preemption under the FAAAA.
On July 22, 2015, plaintiffs filed a response to the aforesaid Notice of Supplemental Authorities, and on August 31, 2015, filed Plaintiffs’ Notice of Supplemental Authority in Opposition to RDI’s Motion for Summary Judgment, once again addressing the applicability of the FAAAA.
Finally, on October 2, 2015, plaintiffs filed an additional notice of supplemental authority in opposition to RDI’s motion for summary judgment once again addressing case law pertaining to the applicability of the FAAAA.
For the reasons hereinafter stated, the plaintiffs’ motion for partial summary judgment must be denied, and the motion for summary judgment of RDI and Deslongchamps must be allowed.
BACKGROUND
The following undisputed material facts are taken from the summary judgment record.
In 1987, Deslongchamps founded RDI. RDI is a motor carrier registered with the Federal Motor Carrier *191 Safety Administration, and regulated by the United States Department of Transportation (“DOT”).
RDI has many years of operating experience in operating an independent delivery service which has grown into a successful business providing to its customers professionally managed logistics services throughout New England and other areas in the United States.
Over the years, RDI has developed a successful business model, pursuant to which it provides so-called “last mile” delivery services to its customers, which are principally furniture companies, and include Jordan’s Furniture, Boston Interiors and Mattress Giant.
RDI’s business model requires that any agreement with third-party truckers to deliver furniture to any of RDI’s customers be with corporately operated businesses.
Each entity is required to execute a contract with RDI entitled “Independent Truckman’s Agreement” (“ITA”).
The circumstances surrounding both Chambers’ and Johnson’s dealing with RDI are somewhat similar. A different trucking company had previously serviced Boston Interiors in connection with delivery of furniture to its customers. Johnson had previously worked for that company, during which time it lost its contract with Boston Interiors, which was then taken over by RDI.
This circumstance then prompted Johnson and his then partner, Daryl McConaga (“McConaga”) to approach RDI to obtain work.
They proceeded to form Dee & Lee, LLC on August 21, 2007, which thereafter entered into an ITA with RDI.[1]
Chambers began his dealings with RDI in 2009. He had previously performed delivery services for approximately fifteen years. He was made aware that RDI would only do business with other businesses, which would act as independent contractors and maintain their own employees. As a result he caused a Subchap-ter S corporation, Three T&C Transport, Inc. (‘Three T&C"), to be formed and designated himself as president of said entity.
On September 20,2009, Chambers executed an ITA as president and CEO of Three T&C. Also on September 20, 2009, both Johnson and McConaga executed an ITA on behalf of Dee & Lee, as co-owners. The ITAs mirror each other, with the exception that the ITA pertaining to Three T&C requires that the contractor deliver consumer items from the retail establishment of Jordan’s Furniture to the residences of Jordan’s customers.
The ITA executed on behalf of Dee & Lee provides that consumer items from the retail establishment of Boston Interiors in Stoughton, be delivered to the residences of Boston Interiors’ customers.
Each of the ITAs provides that it shall be for a three-year duration subject to earlier termination in accordance with the terms of contract. The contractor is required to provide its own manned vehicles and pay all costs of ownership, operation, and maintenance of the same.
Paragraph six of each ITA requires that the contractor provide at its own expense employer’s liability insurance, workers’ compensation insurance, or an approved occupational accident plan. It further requires the contractor to pay all wages and social security and withholding taxes as to its employees.
Paragraph nine of each ITA is entitled “Control and Exclusive Use,” and provides:
In performing services under this agreement the Contractor will direct the operation of his equipment in all respects and will determine the means of performance including, but not limited to, such matters as choice of routes, points of service of equipment and rest stops. RDI shall have no rights to direct or control Contractor in this regard. The parties intend to create and [sic] independent contractor relationship and not an employer-employee relationship.
Paragraph twelve, which is entitled “Nonsolicitation,” precludes the contractor, while performing services under the agreement, or within three (3) years after its termination, from soliciting any of RDI’s employees, customers, or suppliers.
Both Three T&C and Dee & Lee chose to rent delivery vehicles from RDI, which bore RDI’s logo and, in the case of Three T&C, the logo of Jordan’s Furniture, and with respect to Dee & Lee, the logo of Boston Interiors. Said vehicles were owned by RDI, and hence, operated under RDI’s DOT number. RDI did not require the leasing of its vehicles by its contractors, and both Chambers and Johnson, as principals of their respective entities, chose not to purchase their own trucks with their own DOT numbers. As of 2015, RDI does business with approximately eighty contractors, thirty-nine of whom use their own United States DOT number. Furthermore, there is no prohibition on any of RDI’s contractors from running multiple trucks.
Relatively strict guidelines are required to be followed in connection with delivery services, including such matters as to when the customer’s loading docks are open, the wearing of uniforms when required by the customer, general appearance of the contractor’s employees, and certain safely procedures. Also, in light of the fact that entities such as Jordan’s Furniture, Boston Interiors, and Mattress Giant were required to provide their customers with a window of time for furniture delivery, the window for such deliveries was passed on to contractors, and hence, the trucks would be typically loaded -with the last delivery *192 to be loaded first, and the first delivery to be loaded last. Each of the trucks was equipped with a GPS in order that RDI could be aware of their location in the event a question arose as to the status of deliveries.
The evidence reveals that until Dee & Lee ceased its relationship with RDI, it continued to file necessary corporate tax returns, obtain liability insurance, and workers’ compensation insurance for helpers. Principals such as Johnson and Chambers procured occupational accident plans in lieu of workers’ compensation insurance covering themselves while under dispatch and on duty.
Furthermore, income tax returns for the respective entities reflect the 1099 income received from RDI. The plaintiffs were free to hire helpers for their deliveries and did so on multiple occasions.
While the plaintiffs challenge whether or not their respective entities were permitted to do work for other companies, it is clear that in 2011, Three T&C did, on at least one occasion, work for another company in addition to RDI.
By affidavit, Johnson asserts that in making deliveries, he typically worked from 5:00 a.m. to 6:00 p.m., Tuesdays through Saturdays. He also describes certain schedules from 2007 to December 2011 where he would have worked from 5:00 a.m. to 11:00 p.m.
By affidavit Chambers asserts that his typical schedule was Tuesday through Saturday from 5:30 a.m. to 5:30 p.m.
The method of compensation to the plaintiffs’ entities was by virtue of a flat percentage of the value of the furniture that was to be delivered.
While RDI concedes that his contractors were required to deliver furniture within the scope of certain windows, it denies that it controlled the manner and means of the delivery of said items.
DISCUSSION SUMMARY JUDGMENT STANDARD
Summary judgment is appropriate when there are no genuine issues of material fact, and the summary judgment record entitles the moving party to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors, Corp., 410 Mass. 706, 711 (1991). A party moving for summary judgment has the burden of demonstrating there has been no showing of a genuine issue as to any material fact, and that he is entitled to judgment as a matter of law. Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976). The moving party satisfies this burden by submitting affirmative evidence refuting an essential element of the opposing party’s case, or by showing the opposing party has no reasonable expectation of proving an essential element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass, at 716. Once the moving party meets this burden, the burden shifts to the opposing party to allege specific facts that establish the existence of genuine issues of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).
THE WAGE ACT IS PREEMPTED BY THE FAAAA
General Laws c. 149, §148B, provides, inter alia,
(a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:
(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.
sfe * * *
(d) Whoever fails to properly classify an individual as an employee according to this section and in so doing fails to comply, in any respect, with chapter 149 or section 1, 1A, 113, 2B, 15 or 19 of chapter 151, or chapter 62B, shall be punished and shall be subject to all of the criminal and civil remedies, including debarment as provided in section 27C of this chapter. Whoever fails to properly classify an individual as an employee according to this section and in so doing violates chapter 152 shall be punished as provided in section 114 of said chapter 152 and shall be subject to all of the civil remedies, including debarment, provided in section 27C of this chapter . . .
The provisions of G.L.c. 149, §150, require an award of treble damages for lost wages and other benefits, together with cost of litigation and reasonable attorneys fees to a successful plaintiff in a claim under the statute.
The plaintiffs claim that they are clearly RDI’s employees under the second prong of section 148B, claiming that it cannot be demonstrated that the services performed by the plaintiffs fall outside the usual course of the business of RDI.
The plaintiffs further claim that they are also entitled to prevail under both prongs one and three. The independent contractor statute establishes the standard to determine whether an individual who performs services for another shall be deemed to be an employee or an independent contractor for the purpose of the wage statutes. Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009). Applying this standard, any individual performing a service is presumed to be an *193 employee. Depianti v. Jan-Pro Franchising Int’l, Inc., 465 Mass. 607, 621 (2013), quoting G.L.c. 149, §148B(a). The purported employer may rebut the presumption of employment by establishing the three indicia of an independent contractor relationship defined in the statute. Failure to satisfy any prong will result in such individual being classified as an employee, and thus, fail within the protection of the Wage Act and G.L.c. 151, §1A. Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 327 (2015), citing Somers, supra at 589.
While the court finds that there is clearly ample evidence in the summary judgment record to establish genuine issues of material fact precluding summary judgment in favor of the plaintiff, it is unnecessary for the court to address in detail the disputed facts in this action in light of the fact that this court finds that the provisions of G.L.c. 159, §148B, are preempted by the FAAAA.
THE GENESIS AND PURPOSE OF THE FAAAA
Congress determined in 1978 that “ ‘maximum reliance on competitive market forces’ would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act.” Rowe v. New Hampshire Motor Transport Ass’n, 552 U.S. 364, 367-68 (2008), citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992). To ensure that states would not undo federal deregulation with regulation of their own, the Airline Deregulation Act (“ADA”) included a preemption provision that “no State. .. shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.” Rowe, supra at 368, citing Morales, supra at 378; 49 U.S.C.App. §1305(a)(l) (1988 ed.).
In 1980, Congress, byway of the Motor Carrier Act of 1980, deregulated trucking, and in 1994, similarly sought to preempt state trucking regulation by virtue of the Federal Aviation Administration Authorization Act of 1994. Rowe, supra at 368, citing 108 Stat. 1605-06; ICC Termination Act of 1995, 109 Stat. 899. “In so. doing, it borrowed language from the Airline Deregulation Act of 1978 and wrote into its 1994 law that: ”[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." Rowe, supra at 368, citing 49 U.S.C. §14501 (c)(1); see also §41713(b)(4)(A) (similar to the provision for combined motor-air carriers).
Section 601 of the FAAAA addresses both air and motor carriers and contains the following findings:
(a) FINDINGS—Congress finds and declares that—
(1) the regulation of intrastate transportation of
property by the States has—
(A) imposed an unreasonable burden on interstate commerce;
(B) impeded the free flow of trade, traffic and transportation of interstate commerce; and
(C)placed an unreasonable cost on the American consumers; and
(2) certain aspects of the State regulatory process should be preempted.
FAAAA §601(a), codified at 49 U.S.C. §11501.
Congress decided to address these concerns through the device of preemption; Section 601(c)(1) sets out the operative language for the trucking industry. S.C. Johnson & Son, Inc. v. Transport Corp. of America, Inc., 697 F.3d 544, 548-49 (2012).
Sections 601(c)(1) of the FAAAA provides, inter alia,
(1) GENERAL RULE—Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or a political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of a law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4) of this title) or any motor private carrier with respect to the transportation of property.
FAAAA §601(c), codified at 49 U.S.C. §14501(c)(l).
Both the ADA and the FAAAA share a common congressional objective, with the FAAAA adopting the preemption standard contained in the ADA decisions. The application by the courts of both acts is instructive.
In Morales, supra, the Supreme Court considered whether the ADA preempted the enforcement by the attorney general for the state of Texas, of certain guidelines promulgated by the National Association of Attorneys General (“NAAG”). These regulations contained standards governing the content and format of airline advertising, the awarding of premiums to frequent flyers, and payment of compensation to passengers who gave up their seat on overbooked flights. The guidelines did not purport to create any new laws or regulations applying to the airline industry; but rather, claimed to “explain in detail how existing state laws apply to air fare advertising and frequent flyer programs.” Id. at 379, citing NAAG Guidelines, Introduction (1988).
The court thus turned to the question of whether the enforcement of the NAAG Guidelines through the States’ general consumer protection laws was preempted by the ADA.
The court observed that section 1305(a)(1) of the ADA expressly preempted the States from enacting or enforcing any law, rule, regulation, standard or other provision having the force and effect of law relating to routes, rates or services of any air carrier. The Supreme Court stated:
For purposes of the present case, the key phrase, obviously, is “relating to.” The ordinary meaning of these words is a broad one—"to stand in some relation; to have bearing or concern; to pertain; *194 refer; to bring into association with or connection with," Black’s Law Dictionary 1158 (5th ed. 1979)— and the words thus express a broad preemptive purpose.
In Morales, the Attorney General argued that the Federal Aviation Act of 1958 (“FAA”) contained a general “remedies” savings clause which preserved remedies which exist at common law or by statute. The Supreme Court soundly rejected this argument noting that under common statutory construction, specific governs general, and that a canon “particularly pertinent here, where the ‘saving’ clause is a relic of the pre-ADA/no preemption regime.” Morales, 504 U.S. at 384-85.
The Supreme Court observed that beyond the guidelines’ express reference to fares, state restrictions had “. . . the forbidden significant effect upon fares . .. Restrictions on advertising ‘serve to increase the difficulty of discovering the lowest cost seller and reduce the incentive to price competitively.’ ” Id. at 388, citing Bates v. State Bar of Arizona, 433 U.S. 350, 364 (1977).
In rejecting Texas’s contention that the Court’s ruling was so broad so as to lead to preemption of state laws against such areas as gambling and prostitution as applied to airlines, the Court stated that state laws preventing obscene depictions would be “far more tenuous,” and that some state actions may affect fares in “too tenuous, remote or peripheral a manner to have a preemptive effect.” Morales, supra at 390, citing Shaw v. Delta Airlines, Inc., 463 U.S. 85, 100 n.21 (1983).
In American Airlines, Inc. v. Wolens, 513 U.S. 219, (1995), the Supreme Court once again addressed the preemptive effect of the ADA in the context of a consumer fraud act in effect in the state of Ohio proscribing unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business. The action was instituted by members of a frequent flyer program claiming breach of contract in violation of the aforementioned consumer fraud statute. The Court in Wolens, relying substantially on Morales, once again concluded that the ADA’s preemption clause, read together with the FAAAA’s saving clause, precluded the States from imposing their own substantive standards with respect to rates, routes or services, “. . . but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated.” Wolens, supra at 232-33.
Finally, in Rowe, supra, the Supreme Court considered whether a certain statute enacted by the state of Maine entitled “An Act to Regulate the Delivery and Sales of Tobacco Products and to Prevent the Sale of Tobacco Products to Minors” was preempted by the preemption clause contained in the FAAAA (49 U.S.C. § 14501(c)(1)).
The Rowe court considered the determinations made in Morales that: (1) state enforcement actions having a connection with, or reference to “carrier” rates, routes, or services are deemed preempted; (2) that such preemption may occur even if a state’s law’s effect on rates, routes, or services is only indirect; (3) that, with respect to preemption, it makes no difference whether a state law is consistent or inconsistent with federal regulation; and (4) that preemption occurs at least where state laws have a “significant impact” related to Congress’s deregulatoiy and preemption objectives.
The Rowe court observed that Morales “. . . described Congress’ overarching goal as helping assure transportation rates, routes, and services that reflect ‘maximum reliance on competitive market forces’ thereby stimulating ‘efficiency, innovation, and low prices,’ as well as Variety’ and ‘quality.’ ” Rowe, supra at 370-71, citing Morales, supra at 378; Wolens, supra at 228.
The Maine statute in question required that licensed retailers of tobacco products utilize a delivery service which provided a recipient verification service, and required that such service make certain that: (1) the person who bought the tobacco is the addressee; (2) the person to whom the package is addressed is of legal age to purchase tobacco; (3) the addressee has signed for the package; and (4) the addressee, if under the age of twenty-seven (27), produced a valid government-issued photo identification. The Court observed that while this regulation was less direct than it might be because it tells shippers what to choose, rather than telling the carriers what to do. The Court stated, however, that the effect of the regulation was that carriers have to offer tobacco delivery services that “. .. differ significantly from those that, in the absence of the regulation, the market might dictate.” Rowe, supra at 372.
Maine argued that the regulation would not impose any significant additional costs on carriers (which was denied by the carriers); however, the Court noted that the “deemed to know” provision of the recipient verification provision “. . . would freeze in place and immunize from competition a service-related system that carriers do not (or in the future might not) wish to provide.” Id. at 373.
The Rowe court further observed that merely because the statute in question had a public health objective, such fact alone does not create an exception to the preemption doctrine in that the act does not specifically refer to any public health exception, but rather, specifies certain specifically exempted areas. Id. at 374. The Court found that the Maine statute was not so tenuous, remote or peripheral as to preclude preemption, and that the impact thereof upon the defendant was significant, thereby limiting the carrier’s ability to provide incompatible alternative *195 services because the state sought to enlist motor carriers as allies in enforcement efforts.
The First Circuit has recognized “all three of the major Supreme Court cases [Morales, Rowe and Wolens] endorsed preemption and read the preemption language broadly,... and none adopted plaintiffs’ position in this case that we should presume strongly against preempting in areas historically occupied by state law.” DiFiore v. American Airlines, Inc., 646 F.3d 81, 86 (2011).
In DiFiore, American Airlines sought to charge a $2.00 bag checking fee with respect to curbside service called “skycaps.” The plaintiffs argued that such approach was deceptive in that it was considered by many to constitute a mandatory gratuity for skycaps porters resulting in members of the public failing to provide any additional tips to the porters. As a result of the new regulations, the porters’ tips significantly fell. The plaintiff asserted that the subject check-in fee violated G.L.c. 149, §152A, constituted common-law tortious interference with advantageous relations, conversion and unjust enrichment. The Massachusetts Tip Law was the centerpiece of the appeal, and in particular, the language therein providing that “[n]o employer or other person shall demand ... or accept from any . . . service employee . . . any payment or deduction from a tip or service charge to such . . . service employee ... by a patron.” The term “service charge” is defined as:
[A] fee charged by an employer to a patron in lieu of a tip to any . . . service employee . . . including any fee designated as a service charge, tip, gratuity, or a fee that a patron or other consumer would reasonably expect to be given to a . . . service employee ... in lieu of, or in addition to, a tip.
The Court focused on the statutory language “related to a price, route, or service,” and observed that the tips law does more than simply regulate the employment relationship between skycaps and the airline, and had a “. . . direct connection to air carrier prices and services and can fairly be said to regulate both.” DiFiore, supra at 87.
The First Circuit concluded that the tips law, as sought to be applied, directly regulated how an airline service is performed and how its price is displayed to customers and also how the airline behaves as an employer. Id. at 88. The court rejected plaintiffs’ contention that the application of the tips law was tenuous, remote or peripheral, observing that the Supreme Court used as examples limitations on gambling, prostitution or smoking in public places, which are comparatively remote to transportation function. Id. at 89.
In Massachusetts Delivery Ass'n v. Coakley, 769 F.3d 11 (2014) (“MDA”), the First Circuit considered whether the preemption provision of the FAAAA preempted Prong B of G.L.c. 149, §148B(a)(2), which required that workers perform a service “outside the usual course of the business of the employer” to be classified as independent contractors. The court reversed the district court’s finding which held that said section was not preempted, and remanded the matter for further consideration in light of the court’s opinion.
In MDA, the plaintiff in its complaint for declaratory relief alleged that many members engaged as independent contractor delivery drivers with entities that engage independent contractor delivery drivers, and thus arguably violate the statute placing them in peril of an enforcement action and civil actions by private parties. The First Circuit issued an in-depth decision referring to congressional intent in connection with the enactment of the ADA and FAAAA, and noted that the Supreme Court had recently highlighted the breadth of the test when it held that at common law, a claim for breach of an implied warranty covenant “relates to” airlines’ prices, routes, or services. Id. at 18, citing Northwest, Inc. v. Ginsberg, 134 S.Ct. 1422, 1430-31 (2014). The Attorney General attempted to argue that general State employment statutes are per se tenuous and remote. The court observed, however, that such approach “runs counter to Supreme Court precedent broadly interpreting the ‘related to’ language in FAAAA.” MDA, supra at 19.
The First Circuit further concluded that “. . . a statute’s ‘potential’ impact on carriers’ prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote or peripheral. We have previously rejected the contention that empirical evidence is necessary to warrant FAAAA preemption, and allowed courts to ‘look to the logical effect that a particular scheme has on the delivery of services or the setting of rates . . . this logical effect can be sufficient even if indirect...’" Id. at 21.
The court further stated that it was not immunizing carriers from all state economic regulations, but rather, was “. . . following Congress’s directive to immunize motor carriers from state regulations that threaten to unravel Congress’s purposeful deregulation in this area.” Id. The court observed that subjecting carriers to section 148B potentially impacts services that the delivery company provides, and the prices charged for the delivery of properly and the routes taken during delivery, and that “[t]he law clearly concerns a motor carrier’s transportation of property.” The court remanded the case to the district court for a determination as to whether the effect on prices, routes, and services rose to the level of FAAAA preemption. Id. at 23.
On remand, the District Court concluded that the B prong of the independent contractor statute was preempted by the FAAAA. Massachusetts Delivery Ass’n v. Healey, Civ. Action No. 10-cv-1 1521 (D.Mass. July 8, 2015) {“MDA I"). The court observed that most MDA members had hired independent contractors to provide delivery services. The court further noted the Supreme Court’s instruction that the “related to” lan *196 guage was meant to be construed broadly, and consistent with Congress’s intention that preemption should have an expansive reach. Id. at 5, citing Tobin v. Federal Express Corp., 775 F.3d 448, 454 (1st Cir. 2014).
The court stated that the First Circuit had instructed it to “ ‘engage with the real and logical effects of the state statute’ in determining whether section 148B ‘has a forbidden significant effect on even one motor carrier.’ Even the ’ ’’potential" impact on carriers’ prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote or peripheral.’ ‘Empirical evidence is not necessary to warrant FAAAA preemption’ if the ‘logical effect that a particular scheme has on the delivery of services or setting of rates’ is ‘sufficient even if indirect..We are following Congress’s directive to immunize motor carriers from state regulations that threaten to unravel Congress’s purposeful deregulation in this area." Id. at 6, quoting MDA, 769 F.3d at 21. The court further observed that the First Circuit had recently reaffirmed the above principles in rejecting a categorical rule that there must be a record on the effect of the challenged scheme on prices or services, and that “[ijnstead, courts may examine ‘the logical effect that a particular scheme has on the delivery of services or the setting of rates.’ ” Id. at 7, quoting MDA, 769 F.3d at 21; Overka v. American Airlines, Inc., 790 F.3d 36, 40 (1st Cir. 2015).
The court then conducted an analysis as to the impact of section 148B upon MDA. In particular, it noted that application of the statute would require that routes be modified, and that the use of delivery vehicles owned might require MDA to change its routes. The court further observed that the application of section 148B implicated the meal break provision of G.L.c. 149, requiring that a thiriy-minute meal break be provided to persons required to work more than six hours per day. Therefore, any routes requiring that the driver drive more than six consecutive hours would have to be modified. Further implicated is G.L.c. 149, §47, requiring that if an employee is required to work on a Sunday, that he shall be provided with an additional day off. Furthermore, MDA argued that on demand couriers’ profitability depends upon a flexible workforce that does not need to be compensated while waiting for work. The court further observed that the Attorney General was seeking in such action to enforce a policy of hiring employees when market forces prompted delivery companies to adopt an independent contractor model. MDA I, Civ. Action No. 10-cv-l 1521 at 8-10.
The court found that to avoid increased costs, it would logically be required to assign multiple delivery routes to the same employee. The court further observed that to apply section 148B, in the circumstances at hand would increase MDA’s prices by increasing its costs, by virtue of multiple additional costs incurred in depending upon employees as opposed to independent contractors. The court cited as examples the payment of payroll taxes such as social security, Medicare and unemployment insurance. Id. at 11.
It was further observed that the application of section 148B implicated chapter 151, obligating that no matter how employees are paid, they receive at least minimum wage, and further, that pursuant to G.L.c. 151, §1A, employers would be required to pay time and one-half for hours beyond forty hours per week. Thus, routes requiring more than forty hours to complete would, in the future, require multiple employees to avoid the additional labor expense while only one independent contractor is presently required to service the subject route. Id. at 12-13.
The court further referenced that MDA had submitted evidence which quantified its increased costs in the event independent contractors were required to be converted into employees. These expenses were challenged by the Attorney General as being greatly exaggerated, and creating issues of material fact precluding summary judgment. The Attorney General also claimed that the carrier overstated the number of couriers it would need to hire to service the business and their wage rate, as well as the cost of employee benefits such as workers’ compensation, social security and Medicare. The court observed that the Attorney General conceded that at least there would be some cost increase, but claimed it would not be significant enough to warrant preemption. Id. at 15.
The court rejected these contentions, noting that potential impact on routes, services, and prices is sufficient so long as it is significant rather than tenuous, remote or peripheral, and further, that the court “. . . must look to the potential and logical impact of the statute, even if that impact is indirect. Xpressman [the carrier] is not required to deviate from industry standards or to devise detours around statutory strictures invoked by Section 148B to avoid that impact. To do so would allow state regulation to ‘threaten to unravel Congress’s purposeful deregulation in this area.’ ” Id. at 16-17, citing MDA, 769 F.3d at 21.
The court thus concluded that section 148B had a logically significant effect on the prices, routes, and services, and thus, the applicable provision of section 148B was preempted.
EDI HAS SUFFICIENTLY DEMONSTRATED THAT SECTION 148B HAS A SIGNIFICANT EFFECT ON ITS PRICES, ROUTES, AND SERVICES, HENCE SECTION 148B IS PREEMPTED BY THE FAAAA
The summaryjudgment record includes an affidavit by Deslongchamps, as well as a copy of a portion of Deslongchamps’ deposition of November 25, 2014. Extensive descriptions of RDI’s operations are contained in both documents.[2]
*197 Deslongchamps has indicated that as of January 31, 2015, RDI was doing business with eighty contractors, thirty-nine of whom use their own United States DOT numbers. He further opined that many RDI contractors own their own trucks, and operate multiple trucks on multiple routes. He further has indicated that he does not provide contractors with benefits such as health insurance or retirement, nor does he provide workers’ compensation or pay payroll or unemployment taxes. He further has stated that some of his contractor businesses are owned by multiple individuals who do not personally perform delivery services, but rather hire others to perform such services.
RDI currently employs twenty-nine full-time, and one part-time, employees who perform functions including administrative, clerical, management dispatch, logistics and sales. These employees are paid hourly or by salary, and receive health insurance and 401k benefits. RDI also provides workers’ compensation, insurance for them, and pays payroll taxes and unemployment taxes in connection with their employment. He also has an office manager who handles human resource issues which are few in number.
Much of his affidavit is dedicated to pointing to facts which purportedly support his contention that his contractors are independent contractors, rather than employees as defined by section 148B.
Deslongchamps’ affidavit contains various contentions relating to the impact of switching from an independent contractor model to an employee model. He states that if he were to change to an employee model, he would increase the number of routes run on an annual basis from 33,072 to 39,364. He is also anticipating that the increased routes would increase the numb er of miles driven annually, and would significantly affect the amount of annual diesel fuel consumption.[3]
Deslongchamps also points out that he would also be required to maintain the entire fleet of trucks, an obligation which does not exist with his independent contractor model. He also states that he would have to hire approximately 160 drivers, and 160 assistants to run the 150 trucks needed. His affidavit contains a number of calculations relating to the financial impact of switching to an employee model in the form of overtime, health insurance, 40 lk contributions, social security and Medicare taxes, unemployment insurance, andworkers’ compensation insurance. He further opines that he would be required to hire at least two human resource employees to manage the 320 employees that he would be required to hire. Other items of potential and logical increase include the fact that under an employee model, RDI would be responsible for paying for damages caused during a delivery of merchandise, which is an obligation which the independent contractors are currently required to assume. He states that switching to an employee model would have resulted in a net operating loss for 2015 of over 3 million dollars.
Following the guidance of the federal authorities hereinabove stated, this court finds that the above circumstances are inevitable significant consequences to RDI by virtue of the adoption of an employee model, which the court finds are real and logical effects of the application of section 148B.
Furthermore, Johnson has asserted by affidavit fulfilling delivery schedules beginning at 5:00 a.m., and ending at 6:00 p.m., and during certain periods schedules which were from 5:00 a.m. to 11:00 p.m. Chambers testified as to a delivery schedule spanning fromTuesday through Saturday from 5:30 a.m. to 5:30 p.m. Both parties testified as to occasionally providing services on Sundays and Mondays, although it was disputed as to whether or not this was voluntary or mandatory. Furthermore, the plaintiffs corroborated that the corporations for which they were principals assumed responsibility of truck expenses, workers’ compensation insurance, paying helpers and other miscellaneous expenses, all of which would ultimately be transferred to RDI under an employee model.
The fact that RDI, under an independent contractor model, is able to contract out delivery of specific loads to be delivered within specific delivery windows to the ultimate customer would logically have to be changed in light of the existing duration of the delivery routes in question in order to avoid prohibitive overtime and other employee expenses. To require the subject change would result in a significant and adverse impact with respect to the FAAAA’s ability to achieve its preemption related objectives. Clearly in its application, section 148B relates to a carrier’s prices, routes, and services.
ORDER
For the foregoing reasons, it is ORDERED:
1. That the motion of the plaintiffs, Timothy P. Chambers and Leroy Johnson, for summary judgment be and is hereby DENIED.
2. That the motion of RDI Logistics, Inc. and Richard Deslongchamps, Jr., for summary judgment is hereby ALLOWED.
3. That judgment enter DISMISSING plaintiffs’ amended complaint, with prejudice.
4. That in light of the fact, of the dismissal of the claims of Johnson, the court concludes that the counterclaim of RDI against Johnson, based upon the execution of a release which is claimed to bar this action, is DISMISSED as moot.
5. The claims for indemnification asserted in the third-party complaint are DISMISSED as moot.

 McConaga discontinued his involvement with Dee & Lee prior to the commencement of this action.

 Plainüffs have sought to conduct additional discovery beyond the discovery deadline in connection with Deslongchamps’ affidavits, pursuant to which he references various projected additional expenditures and modifications to RDI’s business model, which will be mandated by the application of section 148B. The court declines to further extend discovery at this point in time in that it is highly *198 unlikely further discoveiy would be of assistance to the court in determining.the issue at hand, and the discoveiy deadline has expired.

 Deslongchamps’ affidavit sets forth specific numbers in connection with each item claimed to be affected by the changing to an employee model.